S. S. Pennock Company, Plaintiff, *v.* Joseph Ferretti, as President of Brotherhood of Wholesale Flower Trade Workers (Inc.), Defendant.

Supreme Court, Special Term, New York County, March 15, 1951.

*Bernard H. Fitzpatrick* and *John H. Archer* for plaintiff.

*Sendler & Tryforos* for defendant.

BENVENGA, J. This is an action in equity for an injunction restraining defendant from picketing plaintiff's premises and for incidental damages.

Plaintiff is a wholesale commission cut flower merchant, with a place of business in Manhattan, New York. It employs about a dozen persons — salesmen, packers, chauffeurs, sweepers, errand boys, and a manager. Its business is one affecting commerce among the several States.

Defendant, a trade union, was organized in October, 1949. Its membership consists of employees of wholesale commission cut flower merchants.

In September, 1949, prior to the organization of defendant, the International Brotherhood of Teamsters (hereinafter referred to as the "Teamsters Union"), communicated with the secretary of the Wholesale Cut Flower Protective Association, a credit association of which plaintiff is a member, informing him that it had been awarded jurisdiction, presumably by the American Federation of Labor, to organize employees of the wholesale houses.

In December, 1949, defendant mailed to each of the wholesale houses, including plaintiff, a proposed "recognition agreement", whereby each employer who signed would agree to recognize defendant as collective bargaining representative for its employees.

Shortly thereafter, when counsel for defendant sought to persuade plaintiff's president to sign the recognition agreement, he took the position that, in view of the competition between the two unions, the defendant should establish its claim for majority representation by an election to be conducted by the National Labor Relations Board, and offered to co-operate by voluntarily supplying information which would make pos-

sible a speedy " consent election " without the formality of a hearing. In consequence, defendant filed with the labor board its petition for an election among plaintiff's employees. Charges of unfair labor practices having been preferred by the Teamsters Union against the defendant and an association which had recently been formed, composed of employers who had signed the recognition agreement, action on defendant's petition had to be postponed pending investigation. Plaintiff has never signed the recognition agreement, nor become a member of the association. It has consistently adhered to its policy of neutrality between the competing unions.

Following the charges of unfairness, the Teamsters Union, which had been picketing some individual shops, commenced to picket the entire market, and continued the picketing for some months thereafter.

In March, 1950, defendant withdrew its petition, thereby terminating the proceedings before the labor board without an election. Plaintiff thereupon filed a petition requesting the labor board to determine whether it should recognize either of the two competing unions as the bargaining representative of its employees. Thereupon the parties entered into a stipulation, which was filed with the labor board, whereby defendant " disclaimed " that it was the bargaining representative of plaintiff's employees or that it sought to represent them for bargaining purposes. By the same stipulation, the parties agreed to the withdrawal, without prejudice, of plaintiff's petition for an election. In this manner, all proceedings before the labor board, including the charges of unfairness preferred by the Teamsters Union, were completely terminated.

While defendant was trying to persuade plaintiff and other employers to sign the recognition agreement or to become members of the employers' association, it was also trying to convince their employees to join its union. This dual campaign proceeded simultaneously. Indeed, following the mailing of the recognition agreement, defendant's president visited plaintiff's shop and induced plaintiff's employees to sign the constitution as charter members. However, they did not sign with the intention of becoming members in good standing, but felt constrained to do so in order that there might be no interference with plaintiff's Christmas business. Moreover, despite persistent efforts on the part of defendant, they refused to attend meetings or to pay their fees or dues, or to take any interest in the activities of defendant. In consequence, they were first suspended and finally expelled.

In March, 1950, following the suspension of plaintiff's employees, plaintiff's premises were picketed. The picketing started before Easter and continued until shortly thereafter. Then, after the expulsion of plaintiff's employees in the middle of December, 1950, picketing was resumed. It is still continuing. Plaintiff's employees have not participated in the picketing, nor have they been on strike. They are either satisfied with the terms and conditions of their employment, or do not desire to join the defendant union or to be represented by it as bargaining representative.

It is undisputed that, before the picketing started defendant telegraphed a group of haulers engaged in delivering merchandise to wholesalers (each of whom had had substantial business relations with plaintiff), notifying them that it intended to picket an "unfair shop" and urging them to "prepare to respect our lines". While plaintiff is not named in the telegram, it was a matter of common knowledge that plaintiff's shop was to be picketed.

During the picketing, the pickets carried a placard bearing a legend to the effect that plaintiff "does not employ" members of defendant union. In addition, the pickets (some of whom were employees of other wholesalers) solicited customers and prospective customers not to patronize plaintiff's shop, exhorting them to "pass them by"; "Pennock is unfair"; "be good to the boys in the market; they will be good to you"; "all the other houses have all the flowers that Pennock have; you don't have to buy from Pennock; there are plenty of flowers in all the other places"; etc.

The questions thus presented are: (1) whether the picketing is lawful, and (2) whether the sign is false or misleading. In determining these questions, it is to be noted that there is no controversy between the plaintiff and its employees; they are not on strike, nor have they participated in the picketing; that plaintiff, at the very outset, suggested the advisability of a labor board election, by reason of the competition between defendant and Teamsters' Union; that, acting upon plaintiff's suggestion, defendant actually petitioned for an election, and when defendant withdrew its petition, plaintiff requested the Labor Board to determine whether it should recognize either of the competing unions as bargaining representative of its employees; that, finally, by stipulation, the proceedings before the labor board were withdrawn without prejudice. In short, plaintiff has consistently adhered to the position that, by reason

of the interunion competition, there should be a labor board election. Defendant has not seen fit to risk an election. As to these facts, there can be no dispute.

It is also to be noted that the picketing, on each occasion, was planned to coincide with the industry's busiest seasons; that the Easter picketing started after suspension of plaintiff's employees for nonpayment of dues, and the Christmas picketing, which is being carried into the current Easter season, began after their expulsion by reason of their obstinate refusal to become active members in good standing.

It is manifest that, while the avowed purpose of the Easter picketing was to obtain recognition of defendant as bargaining representative of plaintiff's employees, and while the ostensible purpose of the current picketing is to organize plaintiff's employees into " good faith " membership, nevertheless the primary objective of the picketing on both occasions was and is to coerce plaintiff into signing the recognition agreement and thus become a member of the employers' association. In other words, the picketing is part of a plan to avoid a labor board election, and deprive plaintiff's employees of their right to vote for bargaining representatives of their own choice.

It follows that, even assuming the present case is one involving or growing out of a " labor dispute " (Civ. Prac. Act, § 876-a, subd. 10; *May's Furs* v. *Bauer*, 282 N. Y. 331, 337–339; *Strauss* v. *Steiner*, 173 Misc. 521; but see *Bond Stores* v. *Turner*, 258 App. Div. 769), as defendant contends, the objective of defendant union is clearly unlawful and should be enjoined (*Haber & Fink, Inc.*, v. " *Jones* ", 277 App. Div. 176, and cases cited; *Building Service Union* v. *Gazzam*, 339 U. S. 532, 540; *Schaler* v. *Horowitz*, 99 N. Y. S. 2d 277).

The recent *Haber-Fink* case (*supra*) is in point. In that case, an election among plaintiff's twenty-one employees was held under the State Labor Relations Act (Labor Law, §§ 700–716) at which twenty votes were cast, two in favor of defendant union as collective bargaining representative, and eighteen for no union. The union opposed the holding of the election. Before the election, the union called out pickets in a hostile demonstration in front of the plaintiff's store; it also tried unsuccessfully to call a strike of plaintiff's employees. After the election, it continued its mass demonstrations. In holding that a temporary injunction was properly granted, the court pointed out (p. 179) that the objectives for which the union was picketing were " clearly specious " — just as are the objectives in the

present case; that "even the peaceful picketing of an employer has been enjoined when conducted in aid of an unlawful objective" (p. 181); as, for instance, "to coerce an employer to bargain with a defeated union following an election under the Labor Relations Act", or "to nullify a labor board election that has resulted in a vote for no union", or to compel the employer "to coerce his employees' choice of bargaining representative" (pp. 181, 183). Reviewing the authorities, State and Federal, the court observed that "the picket line around plaintiff's place of business directly affects, and is intended to affect, plaintiff's business", and held that "if the employees are to be solicited, it must be done in some manner which does not result in coercion of plaintiff" (pp. 182–183).

It is true that in the *Haber-Fink* case, there were mass demonstrations which, of themselves, carried a threat of violence, and that the picketing in the present case has been comparatively peaceful; and that in the *Haber-Fink* case, picketing was carried on before and after the election, while here the picketing was started after defendant had withdrawn its election petition. Nevertheless, the *Haber-Fink* decision, in principle, is decisive of the instant case. There, as here, the purpose of the picketing was in violation of the Labor Relations Act and was being conducted for the purpose of compelling the plaintiff "to coerce his employees' choice of bargaining representative".

In other words, the picketing is contrary to the "declared" policy of the United States and of this State in enacting the Labor Relations Act (see U. S. Code, tit. 29, § 151; Labor Law, § 700) — which is to encourage the practice and procedure of collective bargaining, and to protect the exercise by employees of full freedom of association, organization and designation of representatives of their own choosing; in short, to "end disputes, not continue them" (*Florsheim Shoe Store Co.* v. *Retail Shoe Salesmen's Union*, 288 N. Y. 188, 198; see *Building Service Union* v. *Gazzam*, 339 U. S. 532, 540, *supra*).

It may be observed in this connection that *Exchange Bakery* v. *Rifkin* (245 N. Y. 260), *Stillwell Theatre* v. *Kaplan* (259 N. Y. 405), and other similar cases upon which defendant relies, to the effect that picketing in the absence of a strike is not unlawful, were decided prior to the enactment of the Labor Relations Act, and therefore, so far as the precise question here presented is concerned, are "clearly distinguishable and not in point" (*Florsheim Shoe Store Co.* v. *Retail Shoe Salesmen's Union, supra*, p. 201).

There remains the question whether the sign is false and misleading. It is true, as the sign proclaims, that plaintiff " does not employ " members of defendant union. In that sense, the sign, in and of itself, is not false. Nevertheless, considered in the setting of the occasion (*Nann* v. *Raimist,* 255 N. Y. 307, 318), as it should be, it is misleading, in that it does not tell all the facts. A sign must tell the entire truth; half-truths will not do. For, to paraphrase the language of the *Haber-Fink* decision (*supra*) : to present any true idea of the situation to the public, it would be necessary to show that plaintiff has at all times insisted upon an election to determine whether its employees desired to be represented by defendant, and that defendant is seeking to coerce the plaintiff and its employees into accepting it as the bargaining representative without an election, and thus circumvent the intent and purpose of the Labor Relations Act with reference to collective bargaining. " Manifestly, if this fact had to be made known on the placards carried by these pickets, picketing would automatically end." (P. 183.)

It goes without saying that the sign, read in connection with the charge of " unfair shop " contained in the telegrams and the utterances of the pickets, intends to and does convey the impression that plaintiff's shop is unfair, in the sense that it refuses to employ members of defendant union or of any other labor organization. In that sense, the sign is clearly false and misleading.

As for the question of incidental damages, the amount thereof will be included in the judgment.

Judgment is directed for the plaintiff for the relief demanded. Settle judgment in accordance therewith. This is the decision required by the Civil Practice Act.