S. S. PENNOCK COMPANY, Respondent, *v.* JOSEPH FERRETTI, as President of Brotherhood of Wholesale Flower Trade Workers (Ind.), Appellant.

First Department, March 23, 1954.

*Murray Sendler* of counsel (*Sendler & Tryforos,* attorneys), for appellant.

*Bernard H. Fitzpatrick* and *John H. Archer* of counsel (*Butler, Bennett & Fitzpatrick,* attorneys), for respondent.

BASTOW, J. Presented by this appeal is the labor-law problem as to the degree to which picketing is a privileged activity or an unlawful one that may be permanently restrained. The defendant union appeals from a judgment granting such permanent restraint and assessing against it substantial money damages.

Centered in the vicinity of Sixth Avenue and West 28th Street in New York are some sixty or more commission merchants engaged in the wholesale cut flower business. Plaintiff is one of these merchants. It has stores in several cities with its main office in Philadelphia. For many years these merchants, including the plaintiff, have been members of an association organized originally for credit purposes and known as the Wholesale Cut Flower Protective Association. Prior to 1949 the employees of these merchants had not been organized. In the summer of that year preliminary moves were made by the International Brotherhood of Teamsters, A. F. of L., to organize the industry. The vast majority of these employees decided to organize an independent union. This was done in October, 1949, and the defendant is that union.

Within a short time after the defendant had sent out specimen labor-management contracts to the members of the protective association they had been negotiated and signed with all the members except three. Plaintiff was one of the three that refused to sign. None of plaintiff's stores is organized. Significant in the light of subsequent events is the uncontradicted testimony of defendant's vice-president that in 1950 plaintiff's labor lawyer from Philadelphia told the witness that '' where I [the attorney] am interested, as far as the A. F. of L. is concerned they take up and leave ''. When queried as to how the attorney had twice defeated the A. F. of L. in Philadelphia he replied '' We just guide the employees the way to vote ''.

The plaintiff in 1949 had ten employees. They had been solicited for about two months to join the defendant union and did so as a group on December 22, 1949. Shortly thereafter defendant submitted to plaintiff evidence that all of plaintiff's employees had become members of the union. Plaintiff insisted on an appropriate election. At about this time plaintiff sent one of its officers to confer with the employees in the New York store. It may be found from the evidence that soon after this meeting the employees of plaintiff decided that as a group they would not continue as members of the defendant union. This decision was not communicated to the union but thereafter the

employees ignored the union, attended no meetings and paid no dues.

In January, 1950, the defendant filed with the National Labor Relations Board a representation petition naming the protective association as employer in an industry-wide unit and a separate petition covering the employees of plaintiff. These were held in abeyance pending the determination of charges filed by the Teamsters Union against the defendant and the protective association. In March, 1950, the defendant commenced to picket plaintiff's store. At about the same time the defendant withdrew its representation petition naming plaintiff as an employer. Immediately thereafter plaintiff filed an employer's representation petition alleging that both the Teamsters Union and the defendant were claiming recognition rights. Informal hearings were held before a representative of the National Labor Relations Board and the date of April 25, 1950, was fixed for a final hearing to arrange for an election to determine the asserted rival claims of the defendant and the Teamsters Union.

About April 13, 1950, there was a strange turn of events. One of plaintiff's attorneys sought out the attorney for the defendant and asked for a conference. The former testified " that some harm was being done to the business. The Union and its pickets were getting a little weary of the picketing, and there might be a framework within which we could terminate the matter ". Strange indeed was this action. It is clear that up to this time plaintiff had taken the position that it was neutral; that it was torn between the claims of rival unions; that it welcomed an election and would abide thereby. An election would have placed it upon firm ground as to the wishes of its employees to belong or not to belong to a union. Yet it took the initiative in working out a settlement by which the defendant disclaimed that it was bargaining agent for plaintiff's employees, the representation petition of plaintiff was withdrawn and the charges of the Teamsters Union were dismissed. The picketing ceased and there was no activity on the part of the defendant relating to plaintiff until December, 1950, some eight months later.

During these eight months efforts were made by defendant to have the plaintiff's employees recognize their contractual obligations as members of the union. They did not resign therefrom but paid no dues, attended no meetings and completely ignored the union. Finally at a meeting of the defendant on December 5, 1950, it was voted to expel the employees and picket plaintiff's store. It may be found from the minutes of the meet-

ing that the proposed picketing was to persuade the employees to re-join the union and become bona fide members thereof. This picketing commenced in December and continued until the permanent injunction was granted on April 2, 1951.

In considering the correctness of the decision of the trial court it should be said that we feel the court erred in treating the second episode of picketing as a continuation of the earlier picketing. They were conducted under separate and distinct factual situations and had entirely different objectives. Unless we are to say that organizational picketing is inherently coercive upon an employer it seems clear to us that the permanently enjoined picketing had for its primary purpose a lawful labor objective. Here we find a union with ten members who had joined its union and then refused to either affirm or disaffirm their membership. The employer had had within its reach if not its grasp an election that would have determined the intentions of its employees. If they had voted for no union then subsequent picketing might well have fallen within the ambit of *Florsheim Shoe Store Co.* v. *Shoe Salesmen's Union* (288 N. Y. 188) and *Haber & Fink* v. *"Jones"* (277 App. Div 176, 181) where we said in passing that " even the peaceful picketing of an employer has been enjoined when conducted in aid of an unlawful objective. Such an objective is an attempt to coerce an employer to bargain with a defeated union following an election ".

There is telltale evidence in the record that the employees of plaintiff may well have been under the " guidance " of the employer. Thus, the trial court in an unusual proceeding during the trial permitted the plaintiff to bring its employees into court where a secret ballot was conducted as to whether or not they wanted to join the union. The following colloquy between the court and one of the employees before the ballot was taken is of special interest:

" Mr. Gerbino: One of the boys would like to know from either the Brotherhood lawyers, just what they have to offer in black and white, or what the other company has to offer in black and white. He is not familiar with their offerings.

" The Court: *You may take that up later on. We will do one thing at a time.*" (Emphasis supplied.)

After further proceedings the subject was returned to in the following fashion:

" Mr. Sendler: Your Honor, may I ask whether the Court plans to give effect to the suggestion made by Mr. Gerbino that

some opportunity be afforded these men to hear what the Brotherhood had to tell them?

" The Court: They could join at any time, no matter what happens over here, if you gentlemen desire at any time to join any union or not. It is up to you? "

The employees voted without further enlightenment from anyone. Without passing upon the propriety of such a proceeding we conclude in the light of all the circumstances that the vote was of no evidentiary value. Subsequently these employees were examined by counsel for the defendant. In spite of the secret ballot it was most material to defendant to show the true feelings of these employees, statements they had made on other occasions and any possible coercion or guidance on the part of the employer. The trial court, however, on its own motion summarily foreclosed any examination along these lines upon the ground it was an attempt to invade the secrecy of the ballot the court had conducted.

Upon all the evidence we find that the defendant was acting in good faith in picketing plaintiff's place of business. We disagree with the finding of the trial court that the primary objective of the defendant was " to coerce plaintiff into signing the recognition agreement and thus become a member of the employers' association." (201 Misc. 567.) Neither was the primary purpose of the defendant to bring economic pressure upon the plaintiff to coerce its employees to join the defendant union. On the contrary it is clear and we find that the picketing commencing in December, 1950, was intended by the responsible officers of the union — who were comparative neophytes in the field of labor relations — to persuade plaintiff's employees to become union members in good standing.

It is true that certain acts of the pickets fell within the prohibitions established both by statute and decisions of our courts. These acts, of course, should have been enjoined. These we view, however, as random acts and while unlawful must be distinguished from the primary and lawful purpose of the picketing. Moreover, it is clear that these unlawful acts, which accompanied the picketing, did not so permeate all of defendant's conduct as to require the cessation of all picketing in order to protect plaintiff against injury. Hence, the unlawful acts as distinguished from unlawful purpose were peripheral and section 876-a of the Civil Practice Act remained applicable. Accordingly, we hold it was error for the trial court to grant a broad and sweeping injunction against all picketing by defend-

ant of plaintiff's place of business. The injunction was properly granted against unlawful conduct of the defendant but should have been limited in the first instance to a period of six months as required by subdivision 8 of section 876-a of the Civil Practice Act. (Cf. *May's Furs & Ready-to-Wear* v. *Bauer,* 282 N. Y. 331, and *Busch Jewelry Co.* v. *United Retail Employees' Union,* 281 N. Y. 150.)

Moreover, even if it be assumed that the picketing had the unlawful purpose of attempting to coerce the plaintiff illegally and to bring economic pressure upon it and section 876-a did not apply, we conclude that as a matter of discretion the trial court should have limited the scope and length of the injunctive relief granted. Here there was general peaceableness of the union, inexperience of its officers, their evident good intention generally and their studied effort to follow the law as they saw it. The much cited and discussed case of *Building Service Union* v. *Gazzam* (339 U. S. 532) is to some extent factually comparable to this case. But even there the injunction granted was narrow in its terms and the court was careful to point out that '' Respondent does not contend that picketing per se has been enjoined but only that picketing which has as its purpose violation of the policy of the State. There is no contention that picketing directed at employees for organization purposes would be violative of that policy. The decree does not have that effect.'' (Pp. 539–540.) Until such time as statute or decision of higher authority speaks to the contrary we feel that to grant a broad sweeping permanent injunction upon the facts here presented is to say in effect that picketing is inherently an unlawful activity and not a privileged activity reserved to labor subject to policing by the courts and proper administrative bodies. The permanent injunction granted herein should be dissolved.

We pass to the question of damages awarded in the sum of $6,488.06. It appears the trial court arrived at this amount by accepting plaintiff's claim for loss of business as a result of the picketing. The plaintiff's accountant produced a summary containing the bald statement that during the period from July 1, 1950, to December 14, 1950, there was an actual increase in business amounting to 41.12% over the same period in 1949. The summary then set forth that from December 15, 1950, to the last Saturday in January, 1951, the actual volume of business was $73,622.06. To this figure was added the percentage increase in volume of the base period in 1950 over the same

period in 1949. The average commission of the store was applied to the claimed loss of volume resulting in a claimed loss of commission of $8,650.75. There the plaintiff rested. The defendant then proved that the cut flower business declined in both volume and prices from 20% to 35% in the months of December, 1950, and January, 1951, as compared with December, 1949, and January, 1950. The court apparently accepted this testimony by cutting 25% off plaintiff's claimed damages of $8,650.75. To summarize the foregoing the court first found that plaintiff during the base period was entitled to credit for an increase in business of nearly 50% and then found that during the months damages were claimed both volume and price declined 25% as compared with the same period in the preceding year. The result is that the award rests upon no properly proved facts and is the result of pure speculation. In a seasonal business such as that of cut flowers the obvious basis for damages would have been the volume of business for the same period in the preceding year with due allowances for changes in volume and prices throughout the industry. Loss of profits are only allowable provided they are such as might naturally be expected to follow from the wrongful act and are certain both in their nature and in respect to the cause from which they proceed. (1 New York Law of Damages, § 84; *Schile* v. *Brokhahus*, 80 N. Y. 614). The award may not stand.

While it has been urged upon us to dispose of this case on jurisdictional grounds in the light of the recent decision in the United States Supreme Court in *Garner* v. *Teamsters Union* (346 U. S. 485) we have deemed it preferable to determine the case on the merits rather than to delineate at this time the effect of the *Garner* case upon the decision of our Court of Appeals in *Goodwins, Inc.,* v. *Hagedorn* (303 N. Y. 300).

We have heretofore found that the injunctive relief should have been limited in scope and to a period of not more than six months. This has now become academic because the judgment was entered in April, 1951, and there is no occasion for a new trial. The judgment appealed from should be reversed and the complaint dismissed, with costs.

PECK, P. J. (dissenting in part). The trial court's finding that the primary objective of the picketing in this case was to coerce plaintiff into signing a recognition agreement with the defendant union is sufficiently supported by the evidence to sustain the injunction. I think that we are not warranted on an

appellate review of the record in reversing the finding and dissolving the injunction.

The majority opinion rests upon their finding that plaintiff had interfered with its employees' freedom of choice in respect to union affiliation and representation and that the defendant was justified and acted in good faith in picketing in December, 1950, after eight months of effort to have plaintiff's employees recognize their contractual obligations as members of the union.

My difficulty with this conclusion is threefold: first, I find no showing in the record adequate to support a finding of intervention or interference on plaintiff's part in the employee-union relationship; second, whatever complaint the union might have had in this connection, justifying either proceeding before the National Labor Relations Board or by the counteraction of picketing, was waived in the settlement voluntarily effected with plaintiff in the spring of 1950, by which the petitions of both parties before the board were withdrawn and the pickets were withdrawn; third, there was no effort by the union during the next eight months to gain the support of the plaintiff's employees. On the contrary, there was no communication whatever between the union and the employees during this period and the so-called organizational effort of December, 1950, took the form of initial picketing with signs which were not addressed to the employees but which were calculated to bring pressure upon the employer.

While there is some difference between the parties as to whether the spring and winter picketing should be viewed as connected or unconnected, I would think that unimportant. Regardless of the merits of the conflicting claims and charges made with respect to the earlier events, the parties made their settlement of those differences; all questions of representation were closed out before the Labor Board, the union disclaimed any representation of plaintiff's employees and discontinued picketing. In the light of this settlement, it was not allowable for the union later to revert to its charge that plaintiff had behaved improperly in respect to its employees' union affiliation and representation or to renew picketing on that ancient ground.

Nor do I think that we can view the settlement as strange or draw any inferences from it unfavorable to either party. Defendant's own frank statement of the situation in its brief marks that chapter closed. As stated, the picketing was as regrettable to the Brotherhood as to Pennock and the settlement

was reached. That was a mutually satisfactory end of the matter, mutually arrived at, and we may not now appropriately view that settlement as tainted or as strange or as reflecting upon plaintiff.

I agree with defendant's premise that disclaimer of representation in the spring of 1950 did not prevent it from attempting to organize plaintiff's employees at a later time. It is to be noted, however, as stated in appellant's brief, that "For the next eight months, there was no contact or communication between the Brotherhood on the one hand and Pennock or Pennock's New York employees on the other hand." The crucial question, therefore, is whether the union's picketing instituted in December, 1950, without any previous communication with Pennock's employees, was a good faith recruitment measure or was for the ulterior purpose of gaining recognition from the plaintiff. I think it quite clear from the record which defendant made and the text and context of the picketing that the purpose was coercive as to plaintiff and not persuasive as to its employees. Without any attempt to communicate with the employees, the resolution for the picketing opened with a castigation of the employees, followed by their expulsion from the union. The resolution reveals that the picketing was disciplinary in nature, premised upon a detachment of the employees from the union and aimed at reaching the employer.

I would agree with the majority of the court that damages have not been established and would permit the union to apply to the court for such modification of the injunction at any time as might be appropriate to allow bona fide organizational activity.

The judgment, in my opinion, should be modified to incorporate this permission and to eliminate the award of damages and otherwise should be affirmed.

CALLAHAN and BREITEL, JJ., concur with BASTOW, J.; PECK, P. J., dissents in part, in opinion in which DORE, J., concurs.

Judgment reversed, with costs, and judgment is directed to be entered in favor of the defendant dismissing the complaint herein, with costs. Settle order on notice.