GARNER ET AL., TRADING AS CENTRAL STORAGE &
TRANSFER CO., *v.* TEAMSTERS, CHAUF-
FEURS AND HELPERS LOCAL UNION
NO. 776 (A. F. L.) ET AL.

No. 56.   Argued October 20–21, 1953.—Decided December 14, 1953.

*James H. Booser* argued the cause and filed a brief for petitioners.

*Sidney G. Handler* argued the cause for respondents. With him on the brief were *Edward Davis* and *Morris P. Glushien.*

Briefs of *amici curiae* urging affirmance were filed by *J. Albert Woll, Herbert S. Thatcher* and *James A. Glenn* for the American Federation of Labor; by *Arthur J. Goldberg* and *Thomas E. Harris* for the Congress of Industrial Organizations; and by *Acting Solicitor General Stern, George J. Bott, David P. Findling* and *Dominick L. Manoli* for the National Labor Relations Board.

MR. JUSTICE JACKSON delivered the opinion of the Court.

A decision of the Supreme Court of Pennsylvania has deprived petitioners of an injunction which a lower equity court of the State had granted to prohibit certain picketing by respondent labor union.[1]  The court below reviewed the national Labor Management Relations Act and our applicable decisions, and concluded: "In our opinion such provisions for a comprehensive remedy precluded any State action by way of a different or additional remedy for the correction of the identical grievance."  The correctness of this ruling is the sole issue here.  We granted certiorari.[2]

Petitioners were engaged in the trucking business and had twenty-four employees, four of whom were members of respondent union.  The trucking operations formed a link to an interstate railroad.  No controversy, labor dispute or strike was in progress, and at no time had petitioners objected to their employees joining the union.

---

[1] 373 Pa. 19, 94 A. 2d 893.  The equity court's opinion is reported at 62 Dauphin County Rep. 339.

[2] 345 U. S. 991.

Respondents, however, placed rotating pickets, two at a time, at petitioners' loading platform. None were employees of petitioners. They carried signs reading "Local 776 Teamsters Union (A. F. of L.) wants Employees of Central Storage & Transfer Co. to join them to gain union wages, hours and working conditions." Picketing was orderly and peaceful, but drivers for other carriers refused to cross this picket line and, as most of petitioners' interchange of freight was with unionized concerns, their business fell off as much as 95%. The courts below found that respondents' purpose in picketing was to coerce petitioners into compelling or influencing their employees to join the union.

The equity court held that respondents' conduct violated the Pennsylvania Labor Relations Act.[3] The Supreme Court of the Commonwealth held, quite correctly, we think, that petitioners' grievance fell within the jurisdiction of the National Labor Relations Board to prevent unfair labor practices. It therefore inferred that state remedies were precluded. The dissenting judge thought the federal remedy inadequate, as a practical matter, because the slow administrative processes of the National Labor Relations Board could not prevent imminent and irreparable damage to petitioners. Since our decisions have not specifically denied the power of state courts to enjoin such injury, he thought the injunction should be sustained.

---

[3] The Pennsylvania statute does not specifically prohibit the type of union conduct charged in the complaint. However, the court reasoned that the union was attempting to force petitioners to violate § 6 (c) of the statute, which provides that "It shall be an unfair labor practice for an employer . . . . (c) By discrimination in regard to hire or tenure of employment, or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." Pa. Laws 1937, 1172, Purdon's Pa. Stat. Ann., 1952, Tit. 43, § 211.6.

The national Labor Management Relations Act, as we have before pointed out,[4] leaves much to the states, though Congress has refrained from telling us how much. We must spell out from conflicting indications of congressional will the area in which state action is still permissible.

This is not an instance of injurious conduct which the National Labor Relations Board is without express power to prevent and which therefore either is "governable by the State or it is entirely ungoverned." In such cases we have declined to find an implied exclusion of state powers. *International Union* v. *Wisconsin Board,* 336 U. S. 245, 254. Nor is this a case of mass picketing, threatening of employees, obstructing streets and highways, or picketing homes. We have held that the state still may exercise "its historic powers over such traditionally local matters as public safety and order and the use of streets and highways." *Allen-Bradley Local* v. *Wisconsin Board,* 315 U. S. 740, 749. Nothing suggests that the activity enjoined threatened a probable breach of the state's peace or would call for extraordinary police measures by state or city authority. Nor is there any suggestion that respondents' plea of federal jurisdiction and pre-emption was frivolous and dilatory, or that the federal Board would decline to exercise its powers once its jurisdiction was invoked.

Congress has taken in hand this particular type of controversy where it affects interstate commerce. In language almost identical to parts of the Pennsylvania statute, it has forbidden labor unions to exert certain types of coercion on employees through the medium of

---

[4] *E. g., Algoma Plywood Co.* v. *Wisconsin Board,* 336 U. S. 301, 313; *Bethlehem Steel Co.* v. *New York Board,* 330 U. S. 767, 773; *Hill* v. *Florida ex rel. Watson,* 325 U. S. 538, 539 (and see concurring and dissenting opinions, pp. 544, 547); *Allen-Bradley Local* v. *Wisconsin Board,* 315 U. S. 740, 748–751.

the employer.[5] It is not necessary or appropriate for us to surmise how the National Labor Relations Board might have decided this controversy had petitioners presented it to that body. The power and duty of primary decision lies with the Board, not with us. But it is clear that the Board was vested with power to entertain petitioners' grievance, to issue its own complaint against respondents and, pending final hearing, to seek from the United States District Court an injunction to prevent irreparable injury to petitioners while their case was being considered.[6] The question then is whether the State, through its courts, may adjudge the same controversy and extend its own form of relief.

---

[5] "It shall be an unfair labor practice for a labor organization or its agents— . . . (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership . . . ." § 8 (b), 61 Stat. 141, 29 U. S. C. (Supp. III) § 158 (b).

Subsection (a)(3) reads in part: "It shall be an unfair labor practice for an employer— . . . (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 61 Stat. 140, 29 U. S. C. (Supp. III) § 158 (a).

[6] "The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any district court of the United States (including the District Court of the United States for the District of Columbia), within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper." § 10 (j), 61 Stat. 149, 29 U. S. C. (Supp. III) § 160 (j). Temporary injunc-

Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies. Indeed, Pennsylvania passed a statute the same year as its labor relations Act reciting abuses of the injunction in labor litigations attributable more to procedure and usage than to substantive rules.[7]   A multi-

---

tions have been granted by the district courts upon application by the Board following issuance of complaints charging violations of § 8 (b) (2), *Brown* v. *National Union,* 104 F. Supp. 685; *Douds* v. *Anheuser-Busch, Inc.,* 99 F. Supp. 474; *Jaffee* v. *Newspaper & Mail Deliverers' Union,* 97 F. Supp. 443; *Penello* v. *International Union,* 88 F. Supp. 935, and of other sections of the Act. *Curry* v. *Union de Trabajadores de la Industria,* 86 F. Supp. 707; *Madden* v. *International Union,* 79 F. Supp. 616; *Douds* v. *Local 294,* 75 F. Supp. 414. See *Labor Board* v. *Denver Building & Construction Trades Council,* 341 U. S. 675, 682; *Herzog* v. *Parsons,* 86 U. S. App. D. C. 198, 203, 181 F. 2d 781, 786. See also 61 Stat. 155, 29 U. S. C. (Supp. V) § 178, granting similar initiative powers to the Attorney General when strikes or lockouts imperil the national health or safety.

[7] "(a) Under prevailing economic conditions developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and desig-

plicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law. The same reasoning which prohibits federal courts from intervening in such cases, except by way of review or on application of the federal Board, precludes state courts from doing so. Cf. *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41; *Amalgamated Utility Workers* v. *Consolidated Edison Co.*, 309 U. S. 261. And the reasons for excluding state administrative bodies from assuming control of matters expressly placed within the competence of the federal Board also exclude state courts from like action. Cf. *Bethlehem Steel Co.* v. *New York Board*, 330 U. S. 767.

---

nation of representatives of his own choosing to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint or coercion of employers of labor or their agents in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.

"(b) Equity procedure that permits a complaining party to obtain sweeping injunctive relief that is not preceded by or conditioned upon notice to and hearing of the responding party or parties or that permits sweeping injunctions to issue after hearing based upon written affidavits alone and not wholly or in part upon examination, confrontation and cross-examination of witnesses in open court is peculiarly subject to abuse in labor litigation for the reasons that—

"(1) The status quo cannot be maintained, but is necessarily altered by the injunction.

"(2) Determination of issues of veracity and of probability of fact from affidavits of the opposing parties that are contradictory and under the circumstances untrustworthy rather than from oral examination in open court is subject to grave error.

"(3) Error in issuing the injunctive relief is usually irreparable to the opposing party; and

"(4) Delay incident to the normal course of appellate practice frequently makes ultimate correction of error in law or in fact unavailing in the particular case." Pa. Laws 1937, 1198, Purdon's Pa. Stat. Ann., 1952, Tit. 43, § 206b.

This case would warrant little further discussion except for a persuasively presented argument that the National Labor Relations Board enforces only a public right on behalf of the public interest, while state equity powers are invoked by a private party to protect a private right. The public right, it is said, is so distinct and dissimilar from the private right that federal occupancy of one field does not debar a state from continuing to exercise its conventional equity powers over the other. Support for this view is accumulated from the Act itself, its legislative history, some judicial expression, and professional commentary.[8]

It is true that the Act's preamble emphasizes the predominance of a public interest over private rights of either party to industrial strife, and declares its purpose to proscribe practices on the part of labor and management which are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce.[9] And some language of the

---

[8] Rose, The Labor Management Relations Act and the State's Power to Grant Relief, 39 Va. L. Rev. 765 (1953); Hall, The Taft-Hartley Act v. State Regulation, 1 Journal of Public Law 97 (1952).

[9] "Industrial strife which interferes with the normal flow of commerce and with the full production of articles and commodities for commerce, can be avoided or substantially minimized if employers, employees, and labor organizations each recognize under law one another's legitimate rights in their relations with each other, and above all recognize under law that neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety, or interest.

"It is the purpose and policy of this Act, in order to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe prac-

Act seems to contemplate a remedy to supplement, rather than to substitute for, existing ones.[10]

Also, the Senate Committee, reporting the bill, said:

"After a careful consideration of the evidence and proposals before us, the committee has concluded that five specific practices by labor organizations and their agents, affecting commerce, should be defined as unfair labor practices. Because of the nature of certain of these practices, especially jurisdictional disputes, and secondary boycotts and strikes for specifically defined objectives, the committee is convinced that additional procedures must be made available under the National Labor Relations Act in order adequately to protect the public welfare which is inextricably involved in labor disputes.

". . . Hence we have provided that the Board, acting in the public interest and not in vindication of purely private rights, may seek injunctive relief in the case of all types of unfair labor practices and that it shall also seek such relief in the case of strikes and boycotts defined as unfair labor practices . . . ."[11]

We are also reminded that this Court, in *Amalgamated Utility Workers* v. *Consolidated Edison Co., supra*, at 265, recognized this distinction by saying, "The Board as a public agency acting in the public interest, not any

tices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce." § 1 (b), 61 Stat. 136, 29 U. S. C. (Supp. III) § 141 (b).

[10] ". . . This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise . . . ." § 10 (a), 61 Stat. 146, 29 U. S. C. (Supp. III) § 160 (a).

[11] S. Rep. No. 105, 80th Cong., 1st Sess. 8.

private person or group, not any employee or group of employees, is chosen as the instrument to assure protection from the described unfair conduct in order to remove obstructions to interstate commerce."[12] Various statements may also be cited in which the Board would appear to have recognized a distinction between public and private rights or interest in labor controversies.[13]

It often is convenient to describe particular claims as invoking public or private rights, and this handy classification is doubtless valid for some purposes. But usually the real significance and legal consequence of each term will depend upon its context and the nature of the interests it is invoked to distinguish.

Statutes may be called public because the rights conferred are of general application, while laws known as private affect few or selected individuals or localities.[14] Or public rights may mean those asserted by the state

---

[12] Cf. *Republic Steel Corp.* v. *Labor Board,* 311 U. S. 7, 10: "The Act does not prescribe penalties or fines in vindication of public rights or provide indemnity against community losses as distinguished from the protection and compensation of employees."

[13] See, *e. g.,* Brief for the Board, pp. 14, 43, *Montgomery Building & Construction Trades Council* v. *Ledbetter Erection Co.,* 344 U. S. 178.

[14] See *Unity* v. *Burrage,* 103 U. S. 447. Blackstone noted that "the courts of law are bound to take notice judicially and *ex officio*" of public laws, as contrasted with private laws. 1 Commentaries (15th ed. 1809), 85. The Acts of Congress are classified in publication according to their public or private nature. Some state constitutions make special provisions for private or local bills. See Cloe and Marcus, Special and Local Legislation, 24 Ky. L. J. 351 (1936), for a tabulation of these provisions. The difference in classification is particularly striking in the field of divorce, which was formerly beset by private and local bills. See *Maynard* v. *Hill,* 125 U. S. 190. Many state constitutions now specifically prohibit private laws in the field of divorce. *E. g.,* Ala. Const., Art. 4, § 104 (1); Wyo. Const., Art. 3, § 27.

as a party either in criminal or civil proceedings.[15]
Again, the body of learning we call conflict of laws else-
where is called private international law because it is
applied to adjustment of private interests, while public
international law is applicable to the relations between
states.[16]  At other times, rights will be characterized by
the body of law from which they are derived; but such
distinction between public and private law is less sharp
and significant in this country, where one system of law
courts applies both, than in the Continental practice
which administers public law through a system of courts
separate from that which deals with private law ques-
tions.[17]  Perhaps in this country the most usual differ-

---

[15] Holland, Elements of Jurisprudence (6th ed. 1893), 112, declares
this to be ". . . the radical distinction between Rights, and conse-
quently between the departments of Law."

[16] Goodrich, Conflict of Laws (3d ed. 1949), §§ 1, 5; Cheshire,
Private International Law (4th ed. 1952), 16.

[17] "Since the work of Dicey, the contrast between Continental sys-
tems, which distinguish between administrative law and private law
and have a separate system of law Courts for each, and the Anglo-
American system, which only knows one law and one system of law,
is familiar to Anglo-American lawyers.  No doubt at one time this
gave expression to a profound diversity in the attitude taken by the
two groups of legal systems towards the relations between authority
and individual. . . .  But it is commonplace today that this differ-
ence, so eloquently stated by Dicey, is in substance essentially a
matter of the past, and that even in his own time it was only partly
true. . . .  There is today a vast body of administrative law both
in Britain and the United States, but it has not yet been given a
definite place in the legal system as has been done with administrative
law in many Continental countries. . . .  Such bodies as the British
Broadcasting Corporation, the Agricultural Marketing Boards or, in
the United States, the Interstate Commerce Commission, the National
Labour Relations Board, the Federal Power Commission and hundreds
of others are, in fact, bodies whose status is governed by public law
and which would on the Continent come under administrative juris-
diction. . . ."  Friedmann, Legal Theory (2d ed. 1949), 345.

entiation is between the legal rights or duties enforced through the administrative process and those left to enforcement on private initiative in the law courts.[18]

Federal law has largely developed and expanded as public law in this latter sense. It consists of substituting federal statute law applied by administrative procedures in the public interest in the place of individual suits in courts to enforce common-law doctrines of private right. This evolution, sharply contested, and presenting many problems, has taken place in many other fields as well as in labor law. For example, the common law recognized a shipper's right to have a common carrier transport his goods for reasonable rates, and the right was enforceable in the courts.[19] But this private right proved too costly and sporadic to be effective as trans-

---

[18] Pollock, A First Book of Jurisprudence (6th ed. 1929), 95–98, gives an illuminating discussion. He states in part: "Rules of private law may be said to have remained in a stage where all rules of law probably were in remote times: that is to say, the State provides judgment and justice, but only on the request and action of the individual citizen: those who desire judgment must come and ask for it. Accordingly the special field of such rules is that part of human affairs in which individual interests predominate, and are likely to be asserted on the whole with sufficient vigour, and moreover no public harm is an obvious or necessary consequence of parties not caring to assert their rights in particular cases. . . . There fall more specially under rules of public law the duties and powers of different authorities in the State, making up what is usually known as the law of the Constitution; also the special bodies of law governing the armed forces of the State, and the administration of its other departments; laws regulating particular trades and undertakings in the interest of public health or safety; and in short all State enterprise and all active interference of the State with the enterprises of private men. . . ." Pp. 96–97.

[19] 2 Kent, Commentaries (14th ed. 1896), *598–599; Story, Commentaries on the Law of Bailments (3d ed. 1843), §§ 508, 549; *Lough* v. *Outerbridge,* 143 N. Y. 271, 38 N. E. 292; *Chicago, B. & Q. R. Co.* v. *Jones,* 149 Ill. 361, 374, 37 N. E. 247, 250; see *Munn* v. *Illinois,* 94 U. S. 113, 133–134.

port became a vast enterprise. As to interstate commerce, this right was superseded by the Interstate Commerce Act, which, in the public interest, authorized a public tribunal to prescribe reasonable rates and to award reparations for excessive ones.[20] Of course, this put an end to private litigation in state and federal courts to determine, in the first instance, what rate for carriage is reasonable, although that Act did not expressly abolish the pre-existing private rights.[21]

Even if we were to accept as significant the distinction between public and private rights and regard the national Labor Management Relations Act as enforcing only public rights, the same reasoning would prevent us from assuming that the Pennsylvania labor statute declares rights of any different category. It is true that petitioners sought an injunction to restrain damage to their own business. But the injunction appears to have been granted because the picketing violated the state statute, and neither the statutory language nor the opinion of the Pennsylvania Supreme Court warrants a conclusion that the statute protects private rights, as most authorities would define the term. Passed in 1937, the statute recites that the growing inequality of bargaining power between employers and employees "substantially and adversely affects the general welfare of the State" and that certain practices tend to create "industrial strife and unrest, which are inimical to the public safety and welfare, and frequently endanger the public health." Encouragement of collective bargaining is declared "the public policy of the State." And one subsection reads: "This act shall be deemed an exercise of the police power

---

[20] §§ 11, 15, 16, 24 Stat. 383, 384; § 216, 49 Stat. 558, as amended, 49 U. S. C. §§ 11, 15, 16, 316.

[21] *Texas & P. R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, 443–444; *Lewis-Simas-Jones Co.* v. *Southern Pacific Co.*, 283 U. S. 654, 661.

of the Commonwealth of Pennsylvania for the protection of the public welfare, prosperity, health, and peace of the people of the Commonwealth." [22]

This language is comparable, on the state level, to the language in the federal Act. If Congress was protecting a public, as opposed to a purely private, interest, the same could be said of the Pennsylvania Legislature. The State Supreme Court has not said otherwise.[23] The court opinion, of course, did not analyze in detail the state law basis for injunction in this case because it found lack of state jurisdiction, and the dissenting opinion discussed the jurisdictional aspect of the case and did not reach the merits. But we find no basis at all for petitioners' argument that the equity courts, which in Pennsylvania enforce the labor relations statute, would enforce rights of any different category, or of any less public or more private character, than those enforced by the National Labor Relations Board.

Further, even if we were to assume, with petitioners, that distinctly private rights were enforced by the state authorities, it does not follow that the state and federal authorities may supplement each other in cases of this type. The conflict lies in remedies, not rights. The same picketing may injure both public and private rights. But when two separate remedies are brought to bear on

---

[22] §§ 2 (a), (c), (e), Pa. Laws 1937, 1169, 1170, Purdon's Pa. Stat. Ann., 1952, Tit. 43, §§ 211.2 (a), (c), (e).

[23] The same court has said of the Act in a different factual context: "It is inimical to the public interests, as declared in the preamble to our act, that those deprived of a particular employment, where such status is due to what is determined to be unlawful conduct on the part of the employer, should be deprived of compensation or wages when the employee by a reasonable effort could have secured employment which he was physically and mentally fitted to perform. If this rule is not followed the purposes of the act will not be fulfilled and the community will suffer." *W. T. Grant Co.* v. *United Retail Employees*, 347 Pa. 224, 226, 31 A. 2d 900, 901.

the same activity, a conflict is imminent. It must be remembered that petitioners' state remedy was a suit for an injunction prohibiting the picketing. The federal Board, if it should find a violation of the national Labor Management Relations Act, would issue a cease-and-desist order and perhaps obtain a temporary injunction to preserve the *status quo*. Or if it found no violation, it would dismiss the complaint, thereby sanctioning the picketing. To avoid facing a conflict between the state and federal remedies, we would have to assume either that both authorities will always agree as to whether the picketing should continue, or that the State's temporary injunction will be dissolved as soon as the federal Board acts.[24] But experience gives no assurance of either alternative, and there is no indication that the statute left it open for such conflicts to arise.

The detailed prescription of a procedure for restraint of specified types of picketing would seem to imply that other picketing is to be free of other methods and sources of restraint. For the policy of the national Labor Management Relations Act is not to condemn all picketing but only that ascertained by its prescribed processes to

---

[24] *International Union* v. *William D. Baker Co.*, 100 F. Supp. 773, illustrates the potentialities of conflict. A disagreement arose between a union and several contracting associations over a collective bargaining agreement. The agreement contained a no-strike provision. The union, contending that the agreement had come to an end, threatened to strike. The association obtained an injunction in the Pennsylvania courts restraining the members of the union from striking. The union prayed for an injunction in federal district court to prevent the associations from enforcing their state decree. The federal court held that, even if exclusive jurisdiction over the subject matter was in the federal courts, it had no power to enjoin enforcement of the state injunction. Whether this conclusion be correct or not (for a critical comment see Note, 48 Northwestern U. L. Rev. 383 (1953)), the case exemplifies the type of difficulty inherent in recognizing state supplemental relief in an otherwise exclusive federal field.

fall within its prohibitions. Otherwise, it is implicit in the Act that the public interest is served by freedom of labor to use the weapon of picketing. For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits.

Whatever purpose a classification of rights as public or private may serve, it is too unsettled and ambiguous to introduce into constitutional law as a dividing line between federal and state power or jurisdiction. Perhaps the clearest thing to emerge from the best-considered literature on this subject is that the two terms are not mutually exclusive, that the two classifications overlap,[25] and that they are of little help in cases such as we have here. In those cases where this Court has employed the term, it has been chiefly as an aid in statutory construction. Cf. *Federal Trade Commission* v. *Klesner,* 280 U. S. 19.

Our decisions dealing with injunctions have been much concerned with the existence and nature of private property rights, but no case is cited or recalled in which this Court has recognized the distinction between private and public rights to reach such consequences as are urged here. *Myers* v. *Bethlehem Shipbuilding Corp.,* 303 U. S. 41; *Frost* v. *Corporation Commission,* 278 U. S. 515; *Cavanaugh* v. *Looney,* 248 U. S. 453; *International News Service* v. *Associated Press,* 248 U. S. 215; *In re Debs,* 158 U. S. 564; *In re Sawyer,* 124 U. S. 200.

We conclude that when federal power constitutionally is exerted for the protection of public or private interests,

---

[25] Pollock, n. 18, *supra,* at 99, says, "It will be seen, therefore, that the topics of public and private law are by no means mutually exclusive. On the contrary their application overlaps with regard to a large proportion of the whole mass of acts and events capable of having legal consequences."

or both, it becomes the supreme law of the land and cannot be curtailed, circumvented or extended by a state procedure merely because it will apply some doctrine of private right. To the extent that the private right may conflict with the public one, the former is superseded. To the extent that public interest is found to require official enforcement instead of private initiative, the latter will ordinarily be excluded. Of course, Congress, in enacting such legislation as we have here, can save alternative or supplemental state remedies by express terms, or by some clear implication, if it sees fit.

On the basis of the allegations, the petitioners could have presented this grievance to the National Labor Relations Board. The respondents were subject to being summoned before that body to justify their conduct. We think the grievance was not subject to litigation in the tribunals of the State.

*Judgment affirmed.*