J. Irwin Shapiro, J.
This is an application for an order “ temporarily and during the pendency of this action, enjoining and restraining the defendants, their agents, servants, employees, representatives and attorneys, and any of them, from interfering, directly or indirectly, with the plaintiff’s business, and from preventing and interfering with the sale and distribution of the various transcribed programs offered by the plaintiff for sale throughout the country,- and from preventing its members from rendering their services in connection with the various programs distributed and sold by plaintiff, and from interfering with the presentation of any program sold by plaintiff by radio stations, agents, advertising agencies, sponsors or purchasers or from broadcasting the same, and enjoining and restraining the defendants from directing or restraining any person, firm or corporation from doing business with the plaintiff, and from inducing in any manner or any device whatsoever the breach or interference with any contract or agreement of the plaintiff for the purchase, sale or distribution of any of the programs sold or distributed by the plaintiff ”.
The American Federation of Television and Radio Artists, sometimes hereafter called “ defendant union ” or “ Aftra ”, is a labor union affiliated with the AFL-CIO. It represents actors, singers, announcers, dancers, extras and other performers engaged in the fields of radio, transcription and television broadcasting. It has been a recognized collective bargaining agent for these performers since 1937, and has negotiated *642 collective bargaining agreements on their behalf with networks, producers and advertising agencies since that time.
It is claimed by Aftra that these collective bargaining agreements have achieved superior working conditions, pensions, welfare and other benefits for its members and that they have also brought stability to the broadcasting field by insuring a fair and uniform code of practice for all employers.
Plaintiff, in support of its application for an injunction pendente lite, alleges in substance (1) that it “is engaged in the business of selling and distributing transcribed radio programs throughout the country. Salesmen are employed who call on various radio stations and sponsors in the several sections of the country as well as representatives in Canada”; (2) that it “ acquires the sales rights to the programs it sells by making contracts for sales representation with the various producers who own the programs ” and that it “ has produced none of the programs and has no ownership interest whatsoever in the programs ” and (3) that various national conventions of the parties in the broadcasting field are held and that ‘ ‘ Representatives of the union and of broadcasting stations attend these conventions”; that the last convention was held in Chicago, Illinois, beginning on April 3, 1960; that “ Plaintiff had space at the convention and had various promotional material on display there which was distributed to the representatives of the broadcasting stations attending the convention ”; that plaintiff prepared and caused to be distributed at the convention a brochure called “Radio’s Newspaper of the Air” which contained ‘ ‘ promotional material in connection with various programs ” and the purpose of which “ was to advertise the latest programs being distributed by plaintiff and which are the subject of an intensive national promotional campaign on plaintiff’s part
That “ Shortly after the convention ended it was made known to me that the defendant labor union expressed its intention to go after each and every one of these latest programs listed in the brochure and to see to it that the plaintiff’s rights in connection with these programs were destroyed, and that no union member would be permitted to work on any of these programs as long as plaintiff had anything whatsoever to do with these programs, and that the union would use every effort to block or prevent sales by plaintiff to radio stations and others ”.
It is then alleged in the moving papers that the “ union began to implement this intention ’ ’ and various factual averments .are made in an effort to establish overt acts by the defendant union in furtherance of its alleged intentions. It is alleged, for *643 instance, that during the first week of May, 1960, the owner and producer of a program entitled “ Young Hollywood ” was told that “he could do no work for the plaintiff and that the union was going after all aftra talent listed on the attached brochure and would see to it that no aftra talent would have anything to do with any programs that the plaintiff sold or distributed ”,
It is further alleged that in connection with the program “ How Come? ”, one of the programs listed on the brochure and distributed by plaintiff, Milton Cross was forbidden by Aftra ‘1 to make any further recordings, claiming that you [Goodman] are on their ‘ black ’ list ”,
Plaintiff further alleges that many years ago he refused to renew a contract which he had with the union “ by reason of the fact that the union entered into a contract with competitors of mine which gave them more favorable terms than they permitted me ” and that “ Since that time, the union has expressed its intention on numerous occasions to drive me out of business.”
The defendant union and the other defendants vigorously deny the truth of plaintiff’s allegations. They assert that plaintiff’s allegations are “ a tissue of falsehoods ” but in view of the conclusion to which I have come, it is unnecessary to pass upon the truthfulness of plaintiff’s allegations. An assumption of truthfulness of the allegations thus made by the plaintiff will be indulged in only in order to permit a discussion of the jurisdictional question involved which, in the court’s opinion, at the threshold precludes the entertainment of plaintiff’s motion.
A summary of the plaintiff’s contentions, as above set forth, indicates that the gravamen of the dispute between the parties is that Aftra stated that it “ would go after ” each and every program distributed by the plaintiff; that no union member would be permitted to work on any of the programs; that a radio station was informed that it would ‘ ‘ have trouble ” if it bought anything from plaintiff and that it was told “ to do no business ’ ’ with the plaintiff; that defendant union told one Dick Strout that neither he nor any other member of the defendant union could “ have anything to do with any programs that the plaintiff sold or distributed ” and that “ other persons and other owners of programs have been similarly approached and threatened ” and that the “actions and threats of the union” have made it necessary for the plaintiff to bring this action and because the union “ is increasing its efforts all the time in all parts of the country to force a halt in our business.”
Tn its memorandum, plaintiff says that z ‘ In the present case there is no labor dispute, by any stretch of the imagination ” *644 because “ the plaintiff is an independent contractor” and, therefore, “ the National Labor Relations Board is specifically excluded from jurisdiction ”. For that statement, title 29 of the United States Code (§ 152, subd. [3]) which reads as follows, is cited: “ The term ‘ employee ’ shall include any employee, and shall not be limited to the employees of a particular employer, * * * but shall not include * * * any individual having the status of an independent contractor”.
Thus, the plaintiff reasons that since it is an independent contractor and the persons, firms and corporations from whom or from which it has acquired distribution rights to the various radio programs involved are similarly independent contractors, there can be no labor dispute.
In thus interpreting the above-cited section, the plaintiff relies on the cases of Arnold Bakers v. Strauss (1 A D 2d 604); Long Is. Daily Press Pub. Co. v. Tomitz (12 Misc 2d 480) and Garnett Upholstering Co. v. Kessler (157 N. Y. S. 2d 420). All of those cases, however, were decided before November 13,1959, when section 8 (subd. [b], par. [4]) of the National Labor Relations Act was amended by the Labor-Management Reporting and Disclosure Act, commonly known as the ‘ ‘ Landrum-Griffin Act ” (Public Law, 86-257, 73 U. S. Stat. 519 [1959]; U. S. Code, tit. 29, § 158).
Since the effective date of that amendment on November 13, 1959, it has been an unfair labor practice for a labor organization or its agents “ to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce ” where the object of such threats, coercion or restraint is “ forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person ”.
A reading of this new section of the Federal law makes it manifest that it covers precisely and literally the actions charged against the defendant union by the plaintiff. It gives jurisdiction to the National Labor Relations Board to prohibit the kind of actions complained of by the plaintiff and embodies the right to give the very relief which the plaintiff asks this court to grant it.
Under this new law, there is no longer any requirement that the activity of a labor organization be directed against an employer or an employee in order to constitute an unfair labor practice. The law, as now amended and expanded, clearly covers activity designed to force or require any person to cease using, selling, or dealing in the products of any other producer *645 or to cease doing business with any other person. It ‘ ‘ intrudes into the so-called independent contractor field ”— “ An entirely new concept has been injected into the law by the addition of Section 8(b) (4) (ii). It is now unlawful to ‘ threaten, coerce or restrain any person ’ for a proscribed objective.” (48 Geo. L. J. 348.)
Having come to the conclusion that perforce the amendment aforesaid, the National Labor Relations Board now has jurisdiction over the controversy between the parties, the authorities make it crystal clear that this court is thereby deprived of jurisdiction to consider the merits of that controversy.
In Weber v. Anheuser-Busch, Inc. (348 U. S. 468, 481) the court said that: ‘ ‘ Where the moving party itself alleges unfair labor practices, where the facts reasonably bring the controversy within the sections prohibiting these practices, and where the conduct, if not prohibited by the federal Act, may be reasonably deemed to come within the protection afforded by that Act, the state court must decline jurisdiction in deference to the tribunal which Congress has selected for determining such issues in the first instance. ’ ’ In that case, the employer plaintiff had secured a restraining order in a Missouri court against the labor union defendant for a number of activities, some of which involved violations of special provisions of the National Labor Relations Act. In reversing the Supreme Court of Missouri, the court said at page 475: “A State may not enjoin under its own labor statute conduct which has been made an ‘ unfair labor practice ’ under the federal statutes.”
In Garner v. Teamsters Union (346 U. S. 485), the question was the degree to which State courts and State administrative agencies could take jurisdiction of disputes or other activities which were comprehended in the National Labor Relations Act, as amended by the Labor-Management Relations Act, 1947, the so-called Taft-Hartley Law (61 U. S. Stat. 136; U. S. Code, tit. 29, § 141 etseq.). In that case, the plaintiff, a trucking business operator, sought to enjoin picketing by the defendant union on the ground that the purpose of the picketing was to encourage or discourage membership in a labor organization, in violation of the National Labor Relations Act. The trial court restrained the picketing. The Supreme Court of Pennsylvania (373 Pa. 19) reversed the decree and dismissed the action upon the ground that the State courts lacked jurisdiction in the premises. In sustaining the Supreme Court of Pennsylvania, the United States Supreme Court unanimously said (346 U. S. 488-491) :
“ Congress has taken in hand this particular type of controversy where it affects interstate commerce. In language almost *646 identical to parts of the Pennsylvania statute, it has forbidden labor unions to exert certain types of coercion on employees through the medium of the employer. It is not necessary or appropriate for us to surmise how the National Labor Relations Board might have decided this controversy had petitioners presented it to that body. The power and duty of primary decision lies with the Board, not with us. But it is clear that the Board was vested with power to entertain petitioners’ grievance, to issue its own complaint against respondents and, pending final hearing, to seek from the United States District Court an injunction to prevent irreparable injury to petitioners while their case was being considered. The question then is whether the State, through its courts, may adjudge the same controversy and extend its own form of relief.
“ Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies. Indeed, Pennsylvania passed a statute the same year as its labor relations Act reciting abuses of the injunction in labor litigations attributable more to procedure and usage than to substantive rules. A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law. The same reasoning which prohibits federal courts from intervening in such cases, except by way of review or on application of the federal Board, precludes state courts from doing so. Cf. Myers v. Bethlehem Shipbuilding Corp., 303 U. S. 41; Amalgamated Utility Workers v. Consolidated Edison Co., 309 U. S. 261. And the reasons for excluding state administrative bodies from assuming control of matters expressly placed within the competence of the federal Board also exclude state courts from like action.” (Emphasis supplied.)
The court concluded as follows (346 U. S. 501): “ On the basis of the allegations, the petitioners could have presented this grievance to the National Labor Relations Board. The respondents were subject to being summoned before that body to justify their conduct. We think the grievance was not subject *647 to litigation in the tribunals of the State.” See, also, to the same effect Guss v. Utah Labor Bd. (353 U. S. 1), in which the court held that the only way in which a State could acquire jurisdiction over an unfair labor practice affecting* interstate commerce was pursuant to a grant of jurisdiction by the National Labor Relations Board and in accordance with subdivision (a) of section 10 of the National Labor Relations Act (U. S. Code, tit. 29, § 160, subd. [a]).
In April of 1959, in San Diego Unions v. Garmon (359 U. S. 236), the court laid down the rule that even where activity of a labor union was only “ arguably ” within the compass of the National Labor Relations Act, a State court was deprived of jurisdiction even if the defendant’s conduct constituted a tort under State law. Said the court (pp. 242, 244): “ The unifying consideration of our decisions has been regard to the fact that Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience * * 8 When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law. Nor has it mattered whether the States have acted through laws of broad general application rather than laws specifically directed towards the governance of industrial relations. Regardless of the mode adopted, to allow the States to control conduct which is the subject of national regulation would create potential frustration of national purposes.”
The reason given by the court (p. 246) for its holding was: “ The governing consideration is that to allow the States to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy. Since the National Labor Relations Board has not adjudicated the status of the conduct for which the State of California seeks to give remedy in damages, and since such activity is arguably within the compass of § 7 or § 8 of the Act, the State’s jurisdiction is displaced.”
The only interpretation in this State of the Landrum-G-riffin Act, which became effective November 13, 1959, of which I am aware is Dooley v. Anton (8 N Y 2d 91) decided on May 27,1960. *648 In that case, the trial court had granted an injunction permanently restraining picketing by two minority unions. The Appellate Division affirmed. Speaking through Judge Fboessel, the Court of Appeals, after finding that the employer’s business activities affected interstate commerce, quoted with approval the language of the Appellate Division, First Department, in Columbia Broadcasting System v. McDonough (8 A D 2d 695 [1959]) where that court said: ‘ ‘ Where, as here, there is an arguable question of jurisdiction, determination in the first instance must be left to the National Labor Relations Board and the State courts are not primary tribunals to adjudicate such issue. (San Diego Unions v. Garmon, 359 U. S. 236.) ” Judge Fboessel in his opinion said (p. 96) that “ any doubt must be resolved in favor of ‘ the exclusive primary competence of the Board ’ ” and he then added (p. 98): “In any event, a compelling reason for reversing the judgment below is that the Landrum-Griffin Amendments to the National Labor Relations Act (Labor-Management Reporting and Disclosure Act of 1959, 73 U. S. Stat. 519 et seq.), which went into effect on November 13, 1959, have effectively rendered moot the issue of State jurisdiction here involved. * * * ‘ This new statutory provision seems squarely to cover the type of conduct involved here ’ (Memorandum of Mr. Justice Stewabt in the Curtis Bros, case, 362 U. S., supra, at p. 292; see, also, 44 Minn. L. Rev. 257, 264), and in any event it is the province of the Board, not the State courts, to decide the issue in the first instance. Since it is now arguably within the compass of the Board’s jurisdiction to enjoin the picketing here involved, the permanent injunction granted below obviously cannot stand.” No matter how the plaintiff’s complaint and affidavits are analyzed, the aggregate import is that the union is attempting “ to threaten, coerce, or restrain” persons “ engaged in commerce or in an industry affecting commerce ” and that it is attempting to force or require such persons ‘ ‘ to cease using, selling, handling, transporting, or otherwise dealing in the products ’ ’ of the plaintiff, and to force them 1 ‘ to cease doing business with any other ” (the plaintiff), all of which are now acts within the purview of section 8 (subd. [b], par. [4]) of the National Labor Relations Act as amended by the Labor-Management Relations Act, 1947, as amended by the Labor-Management Reporting and Disclosure Act of 1959. Under the circumstances, the court is precluded from considering the merits of the plaintiff’s complaint. Its very assertions deprive this court of jurisdiction at the threshold.
*649 Since in my view the court is precluded by section 8 (subd. [b], par. [4]), I have not in this connection deemed it necessary to consider still another amendment in the Landrum-Griffin Act (§8, subd. [b], par. [4], cl. [A]) which now makes it an unfair labor practice for a labor organization “ to threaten, coerce or restrain any person engaged in commerce * * * to enter into any agreement which is prohibited by subsection (e) of this section ”. In essence, that section declares it to be an unfair labor practice for any labor organization to enter into an agreement with any employer whereby the latter will cease doing business with any other person.
Thus assuming, arguendo, the truth of every allegation made by the plaintiff, every act of the defendant union is either affirmatively prohibited or protected by the National Labor Relations Act as amended by the Landrum-Griffin Act. Certain it is from the plaintiff’s own allegations, that the conduct complained of is at least either arguably prohibited or arguably protected by the Landrum-Griffin Act. Therefore, only the National Labor Relations Board has jurisdiction to determine whether the acts complained of were in fact committed and whether they are lawful or unlawful. The field of inquiry in this matter having been pre-empted by the Congress of the United States and reserved by it for the exclusive jurisdiction of the National Labor Relations Board, this court is without jurisdiction in the premises. The motion is denied.