Niles SIPES, Administrator of Estate of Benjamin Owens, Jr., Deceased, Appellant,

v.

Manuel VACA et al., Respondents.

No. 51554.

Supreme Court of Missouri,
En Banc.

Dec. 13, 1965.

Rehearing Denied Jan. 10, 1966.

Allan R. Browne, Ennis, Browne & Martin, Kansas City, for appellant.

Henry A. Panethiere, Russell D. Jacobson, Kansas City, for respondents-defendants.

HOLMAN, Judge.

This action was instituted by Benjamin Owens, Jr., a discharged employee of Swift & Company and a member of the union, as a class action against the membership of the national and local union of the National Brotherhood of Packing House Workers. Certain officers of said unions were individually named as defendants representative of the class. Owens sought to recover actual and punitive damages resulting from his alleged wrongful discharge and the failure of the union to process his protest through all of the administrative appellate procedures provided for in the Master Agreement. The trial resulted in a verdict for plaintiff in the amount of $7,000 actual and $3,300 punitive damages. Upon motion of defendants the trial court set aside the judgment and entered judgment for defendants for the reason that jurisdiction of the subject matter had been preempted by the federal government. Plaintiff appealed to the Kansas City Court of Appeals. He died while the appeal was pending and his administrator was substituted as appellant.

The Kansas City Court of Appeals adopted an opinion affirming the judgment but one of the judges dissented and the court

of its own motion transferred the case here. In that situation we will decide the case "the same as on original appeal." Article V, § 10, Constitution of Missouri 1945, V.A.M.S.

We will continue, for convenience, to hereinafter refer to Benjamin Owens, Jr., as plaintiff. Plaintiff testified that in January 1960, when he was finally discharged by Swift & Company, he was forty-seven years old and had worked sixteen years for Swift; that part of his work was trimming loins, but he also handled heavy halves and quarters of beef; that he had a congenital heart murmur, was troubled with high blood pressure, and had become overweight; that all of his family had had these complaints and had worked hard and lived to a ripe old age; that in May 1959, he had been working long hours, felt bad, and decided to take sick leave for a time and rest up; that at that time he weighed 230 pounds and upon the advice of his physician began to lose weight; that in August his physician, Dr. Alexander, gave him a statement to the effect that he could go back to work and he attempted to do so. However, Dr. Saper, the company's physician, refused to authorize his return to work because of his blood pressure and cardiac condition. In January 1960, plaintiff was examined by Dr. Steinzeig who gave him a statement that he was able to go back to work. He presented this to the company nurse and she authorized his return to work and he worked three days. On the third day, the superintendent apparently learned that plaintiff was back at work and immediately discharged him on the ground that he was not able to work. Plaintiff testified that at that time he felt fine, had reduced his weight to 180 pounds, and was doing the work assigned to him. Plaintiff further testified that during the period from May 1959 to trial time (June, 1964) he had worked on various temporary jobs but could not get regular employment because he did not dare give Swift, his previous employer, as a reference; that he did hard physical labor for Spencer Chemical Company, Shostak Iron and Metal Com-

pany, Guy Campbell, a contractor, Jewish Community Center, and also did such work as cutting grass, trimming trees and things of that nature; that he was able to earn about $1,000 a year at that type of seasonal employment.

After being discharged, plaintiff protested his being denied employment, asserted he was physically able to work, and sought the help of the union in contesting the issue and presenting his grievance. Section XIII of the Master Agreement between Swift & Company and the National Brotherhood of Packing House Workers provided for five administrative appellate steps for handling grievance procedures. The five administrative steps may be briefly described as follows: First step: Aggrieved employee may present his grievance "with or without the union representative" to the foreman of the department. Second step: May present the grievance to the division superintendent. Third step: It may be presented to a grievance committee composed of three union and three company representatives. Fourth step: Reference may be made to the general superintendent of the company with a representative of the national union present. Fifth step: The grievance may be referred by the National Union to one Gabriel N. Alexander, who was designated arbitrator under the Agreement. It is conceded that the union processed plaintiff's grievance, without success, throughout the first four steps. Plaintiff cooperated by furnishing the union the statements of a number of physicians indicating that he was able to resume work. Dr. H. H. Hesser, on March 24, 1960, certified that he had taken plaintiff's blood pressure and that the reading was $\frac{160}{93}$. Dr. Bruce P. McDonald on May 18, 1960, signed the following certificate: "This is to verify Mr. Owens was examined and treated by me this date and that he is released to resume his regular work as of May 23, 1960." On July 6, 1960, Dr. John M. Gill signed a statement to the effect

that he had taken plaintiff's blood pressure that day and the reading was $\frac{160}{100}$. On July 8, 1960, Dr. C. W. Alexander signed the following statement: "This is to certify that Benjamin Owens has been examined by me. His blood pressure is $\frac{160}{100}$. It is my opinion he is physically able to perform regular work." The company in denying plaintiff's reinstatement did not question the qualifications or integrity of any of plaintiff's physicians but contended that it should have a report indicating a more detailed examination. The company also claimed to have a report from Dr. Saper and Dr. Morris which indicated that plaintiff was not physically able to resume his employment. After the close of the hearing on the fourth step, the union and the company agreed that the grievance be held open at that stage pending further developments and the possible obtention of additional evidence. The union representatives suggested that he have a complete examination by a doctor of his choice and the union would pay for the examination. Plaintiff went to Dr. Hesser who sent him to Dr. H. W. Day and, after examining plaintiff, Dr. Day sent a report to the union indicating that plaintiff's blood pressure was $\frac{260}{120}$ and that there was some kidney damage and slight heart damage. He expressed the opinion that plaintiff was not able to work.

Plaintiff testified that he asked Manuel Vaca, president of the local, to carry his grievance to the fifth step but that Vaca stated the union did not have the money to use for that purpose and that he would take it to the fifth step if plaintiff would give him $300, which, plaintiff stated, he refused to do. There is evidence that the executive committee of the local union thereafter decided not to take plaintiff's grievance to the fifth step because there was not sufficient favorable medical evidence. At about that time plaintiff employed an attorney who wrote several letters to Ernest Kobett, vice-president of the National Brotherhood, making inquiry as to what future action was contemplated by the union concerning plaintiff's grievance and Kobett did not answer those letters. This suit was filed by plaintiff against representatives of the union on February 13, 1962.

Defendants' evidence consisted of the testimony of four union officers and representatives. They testified as to the handling of plaintiff's grievance through the first four steps, without success, and as to their reason for refusing to take the fifth step. Manuel Vaca denied that he made any request of plaintiff for $300, or any other amount, and said that it would have been outrageous for an officer of the union to make such a request. Mr. Kobett testified that he attended the fourth step meeting and that, on May 8, 1964, he attended another meeting at which plaintiff's case was called up for review and since there was no new evidence to present he withdrew the grievance. He also stated that the president and general counsel of the National Union had advised him to withdraw the grievance. He further testified that out of 967 grievances filed during the two-year period preceding August 1963, only one had gone to the fifth step. He admitted that he did not obtain plaintiff's consent to withdraw the grievance, nor did he notify plaintiff that such had been done. In regard to the practice of handling grievances for members, he stated that: "* * * the employee who is a member of the union submits his case to be handled by the union officers. When he gives them that case it is theirs to dispose of as long as they go through the steps up to a point where we either feel we have a good case or we don't have a case. Then the union makes the decision * * *."

Plaintiff at trial time testified that he was feeling good and had been working whenever he could get work; that he had worked for Spencer Chemical Company until two weeks before trial, handling bags of

fertilizer weighing 80 pounds for as much as twelve hours a day; that he had been laid off because of lack of work.

As we have indicated, the trial court sustained the defendants' motion for judgment for the reason that "under the pleadings, the law and the evidence, the conduct of the defendants herein was arguably conduct, which is protected by the Labor Management Relations or National Labor Relations Act, 29 U.S.C., Section 151 et seq., so that the jurisdiction over the subject matter of this action has been pre-empted by the passage of said Act by the Congress of the United States, and that exclusive primary jurisdiction over this cause is in the National Labor Relations Board, and not in the courts of the state of Missouri." Upon this appeal the sole contention briefed by appellant is that the trial court erred in setting aside the verdict and entering judgment for the defendants.

The question presented is not an easy one to decide. The difficulties encountered were recognized in the case of Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 480–481, 75 S.Ct. 480, 488, 99 L.Ed. 546, wherein the court stated: "By the Taft-Hartley Act, Congress did not exhaust the full sweep of legislative power over industrial relations given by the Commerce Clause. Congress formulated a code whereby it outlawed some aspects of labor activities and left others free for the operation of economic forces. As to both categories, the areas that have been pre-empted by federal authority and thereby withdrawn from state power are not susceptible of delimitation by fixed metes and bounds. Obvious conflict, actual or potential, leads to easy judicial exclusion of state action. Such was the situation in Garner v. Teamsters, C. & H. Local Union [346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228], supra. But as the opinion in that case recalled, the Labor Management Relations Act 'leaves much to the states, though Congress has refrained from telling us how much.' 346 U.S., at 488, 74 S.Ct. at page 164. This penumbral area can be rendered progressively clear only by the course of litiga-

tion * * *." We have considered many cases cited in the briefs but have concluded that our decision must rest, primarily, upon a correct interpretation of four cases decided by the Supreme Court of the United States. The two cases supporting the view that the state court had jurisdiction are International Association of Machinists et al. v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018, and International Union, United Automobile, Aircraft and Agricultural Implement Workers of America (UAW–CIO) et al. v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030. Two cases which tend to support a contrary view are Local 100 of United Association of Journeymen & Apprentices v. Borden, 373 U.S. 690, 83 S.Ct. 1423, 10 L.Ed.2d 638, and Local No. 207, International Association of Bridge, Structural and Ornamental Iron Workers Union et al. v. Perko, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646.

In Gonzales, the plaintiff, claiming to have been wrongfully expelled from membership, brought suit against the union and obtained a judgment ordering reinstatement and awarding him damages for loss of wages as well as for physical and mental suffering. The Supreme Court held that § 158 of 29 U.S.C.A. did not exclude the exercise of jurisdiction by the state court. In so ruling the court stated that: " * * * the protection of union members in their rights as members from arbitrary conduct by unions and union officers has not been undertaken by federal law, and indeed the assertion of any such power has been expressly denied. * * * The National Labor Relations Board could not have given respondent the relief that California gave him according to its local law of contracts and damages. Although, if the unions' conduct constituted an unfair labor practice, the Board might possibly have been empowered to award back pay, in no event could it mulct in damages for mental or physical suffering. And the possibility of partial relief from the Board does not, in such a case as is here presented, deprive a party of available state remedies for all

damages suffered." 356 U.S. 620, 621, 78 S.Ct. 925.

In Russell, the plaintiff, a nonunion employee, brought a common-law tort action in a state court against a labor union and recovered a judgment for compensatory and punitive damages for malicious interference with his occupation by mass picketing and threats of violence during a strike. Upon review by certiorari the Supreme Court held that Congress had not deprived the victim of tortious conduct of the type there involved of his right of action for all damages suffered. In its opinion the court said: "We conclude that an employee's right to recover, in the state courts, *all* damages caused him by this kind of tortious conduct cannot fairly be said to be pre-empted without a clearer declaration of congressional policy than we find here. Of course, Russell could not collect duplicate compensation for lost pay from the state courts and the Board.

"Punitive damages constitute a well-settled form of relief under the law of Alabama when there is a willful and malicious wrong. Penney v. Warren, 217 Ala. 120, 115 So. 16. To the extent that such relief is penal in its nature, it is all the more clearly not granted to the Board by the Federal Acts. Republic Steel Corp. v. National Labor Relations Board, 311 U.S. 7, 10–12, 61 S.Ct. 77, 78–79, 85. The power to impose punitive sanctions is within the jurisdiction of the state courts but not within that of the Board * * *." 356 U.S. 646, 78 S. Ct. 939.

In Borden, as stated in the syllabus, "Respondent, a member of a local plumbers' union in Shreveport, La., arrived in Dallas, Tex., looking for a job with a construction company on a particular bank construction project there. Although the foreman of the construction company wanted him, he was unable to get the job, because the company's hiring was done through union referral, and the business agent of petitioner, the local plumbers' union in Dallas, refused to refer respondent. Respondent sued petitioner in a Texas State Court, seeking damages for such refusal and alleging that petitioner's actions constituted a willful, malicious and discriminatory interference with his right to contract and to pursue a lawful occupation; that petitioner had breached a promise, implicit in the union membership arrangement, not to discriminate unfairly or to deny any member the right to work; and that it had violated certain state statutes. Petitioner challenged the State Court's jurisdiction." 373 U.S. 690, 691, 83 S.Ct. 1423. The court held that the conduct of the union was arguably protected by § 7 or prohibited by § 8 of the National Labor Relations Act and hence the state court was precluded from exercising jurisdiction. The court said the case was to be distinguished from Gonzales in that Gonzales " * * * turned on the Court's conclusion that the lawsuit was focused on purely internal union matters, i. e., on relations between the individual plaintiff and the union not having to do directly with matters of employment, and that the principal relief sought was restoration of union membership rights. In this posture, collateral relief in the form of consequential damages for loss of employment was not to be denied. * * * The suit involved here was focused principally, if not entirely, on the union's actions with respect to Borden's efforts to obtain employment. No specific equitable relief was sought directed to Borden's status in the union, and thus there was no state remedy to 'fill out' by permitting the award of consequential damages." 373 U.S. 697, 83 S.Ct. 1427.

The Perko case involved a plaintiff who was a member of the union. He sued the union and certain of its officers to recover damages resulting from the acts of defendants in demanding that he be discharged from his duties as a superintendent or foreman. He was discharged and alleged that defendants prevented him from obtaining work as a foreman by representing that his foreman's rights had been suspended. Plaintiff obtained a substantial judgment in the state court and the Supreme Court

granted certiorari. In holding that the state court had no jurisdiction the court stated that: "As in Borden, the crux of the action here concerned alleged interference with the plaintiff's existing or prospective employment relations and was not directed to internal union matters. Indeed the state court itself observed that 'Plaintiff is not attempting to secure any redress for loss of rights as a member of the union.' Supra [373 U.S. p. 703, 83 S.Ct. p. 1430]. Thus there was no permissible state remedy to which the award of consequential damages for loss of earnings might be subordinated." 373 U.S. 705, 83 S.Ct. 1431.

A state court case supporting appellant's contention is Bailer v. Local 470, International Teamsters, etc., 400 Pa. 188, 161 A. 2d 343, 346. Therein the following appears: "Appellant avers in his first claim that the appellee Local breached its fiduciary duty to him in not representing him in good faith before the arbitrator. Our jurisdiction over this claim is clearly not ousted by the Taft-Hartley Act, since appellant is suing solely to enforce his rights as a union member and not to enforce rights of employment * * *." On the other hand, a state court case tending to support the position of defendants is Webster v. Midland Electric Coal Corp., 43 Ill.App.2d 359, 193 N.E.2d 212 [7].

Upon casual consideration it may appear that Borden and Perko conflict with Gonzales. However, it certainly must be said that those cases do not overrule Gonzales, by implication or otherwise, because both of them refer to and distinguish that case. We think it is clear that Borden and Perko are distinguishable, upon the facts, from the case before us. In Borden the union agent willfully refused to let Borden work even though the prospective employer requested that he be referred for a job. Perko lost his job as a foreman because of a dispute with the union as a result of which the union informed Perko's employer that the men would no longer take orders from him.

If, by subsequent opinions, the court has restricted Gonzales and Russell to the pre-

cise factual situations there involved (expulsion from the union and interference with employment by mass picketing and threats), then those cases would not apply in a determination of the case at bar. However, our reading of the various cases does not convince us that such a restricted application of those cases is warranted.

■ We have concluded that the "Labor Management Relations Act," 29 U.S.C.A., §§ 157 and 158, has not pre-empted the jurisdiction of the Missouri courts in the case before us. While we think the facts in this case more strongly support state jurisdiction than the facts in Gonzales, we nevertheless are of the opinion that the Gonzales case is decisive of the issue before us.

We do not think that it could reasonably be argued that the conduct of defendants constituted an unfair labor practice in violation of § 158, supra. Defendants contend that such was an unfair labor practice in that it violated § 158(b) and (b) (2) which read, in part, as follows: "It shall be an unfair labor practice for a labor organization or its agents—* * * (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section * * *." Sections (a) and (a) (3) referred to in the foregoing provide that: "(a) It shall be an unfair labor practice for an employer— * * * (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *." It appears obvious to us that those provisions do not apply to the factual situation before us. Here the union had nothing to do with Owens being discharged. It is evident that that idea originated with the employer. There is no evidence that the union desired that some other particular member of the union obtain the job from which Owens had been discharged. Nor is there any evidence to indicate that the union representatives took any affirmative action to prevent the re-em-

ployment of Owens. He was not expelled or suspended from union membership. The crux of plaintiff's claim was that he was wrongfully discharged by his employer and defendants wrongfully failed and refused to process his claim for reinstatement through the "fifth step" and thus he was prevented from being restored to his job. Discrimination was neither alleged nor submitted to the jury as an element of the claim.

Some of the cases have said that Gonzales involved an internal union matter not directly concerning a matter of employment. Such statements may be technically correct but as a practical matter the real complaint of Gonzales was his inability to obtain employment because of his expulsion from union membership. We see no difference in that situation and the situation in the instant case. We are dealing with an internal union matter in that Owens complained of the refusal of the union to fully process his grievance. He, like Gonzales, hoped that as a result of proper union action he would be restored to his employment. If Gonzales involved a purely internal union matter then the case at bar involves a purely internal union matter. The Gonzales case is clearly applicable here and is ample authority for our conclusion that jurisdiction of the subject matter of this case has not been pre-empted by the Labor Management Relations Act, 29 U.S.C.A. § 141 et seq.

■ Defendants have briefed two alternative contentions which they say support the action of the trial court in entering judgment for them even though we should hold (as we have) that jurisdiction of the subject matter of this claim was not pre-empted by the Labor Management Relations Act, supra. The first of those contentions is: " * * * that under the facts and evidence adduced plaintiff has failed to show that the defendant Union was guilty of bad faith or discriminatory motive in refusing to further handle or process plaintiff's grievance since there was not adequate medical evidence available to show

that plaintiff had a meritorious claim." In considering that point we will view the evidence in the light most favorable to appellant. The essential issue submitted to the jury was whether the union, as plaintiff's agent: " * * * arbitrarily, if so, and without just cause or excuse, if so (and thus with legal malice, if so), refused to carry said grievance, difference and disagreement, if any, through the fifth step, if so, and thus prevented, if so, plaintiff from completing pursuit of his administrative remedies in the above respects * * *."

■ We have concluded that there was sufficient substantial evidence from which the jury reasonably could have found the foregoing issue in favor of plaintiff. It is notable that no physician actually testified in the case. Both sides were content to rely upon written statements. Three physicians certified that plaintiff was able to perform his regular work. Three other physicians certified that they had taken plaintiff's blood pressure and that the readings were approximately 160 over 100. It may be inferred that such a reading does not indicate that his blood pressure was dangerously high. Moreover, plaintiff's evidence showed that he had actually done hard physical labor periodically during the four years following his discharge. We accordingly rule this point adversely to defendants.

■ The other alternative contention is that the judgment for defendants should be affirmed because " * * * it was shown that the fourth step of the grievance was held open and not completed until almost the time of the trial of this cause of action and after the filing of the same and that, as a consequence thereof, the plaintiff has failed to exhaust his administrative and contractual remedies." That point is without merit. Defendants' evidence showed that they were in complete control of the management of plaintiff's grievance. One of the defendants failed to answer several letters he received from plaintiff's attorney inquiring as to what future action was con-

templated concerning the grievance. Finally, without plaintiff's consent, the defendants withdrew it. If plaintiff failed to exhaust his administrative remedies it was entirely the fault of defendants. It is elementary that defendants will not be heard to interpose as a defense to this claim a condition which resulted solely from their action or inaction.

It will be noted that the amount of punitive damages specified in the verdict was $3,300. Reference to the petition discloses that the prayer for punitive damages was in the amount of $3,000. Before the judgment is re-entered, as hereinafter directed, plaintiff should be required to file a remittitur in the amount of $300.

The judgment is reversed and cause remanded with directions to reinstate the verdict and judgment for plaintiff.

All concur.