Mr. Justice Goldberg,
with whom Mr. Justice Harlan and Mr. Justice Stewart join,
dissenting from the opinion but concurring in the reversal in No. 48 and concurring in the judgment of the Court in No. 240.
Stripped of all the pejorative adjectives and reduced to their essential facts, both Pennington and Jewel Tea represent refusals by judges to give full effect to congressional action designed to prohibit judicial intervention via the antitrust route in legitimate collective bargaining. The history of these cases furnishes fresh evidence of the observation that in this area, necessarily involving a determination of “what public policy in regard, to the industrial struggle demands,” Duplex Co. v. Deering, 254 U. S. 443, 479, 485 (dissenting opinion of Mr. Justice Brandéis), “courts have neither the aptitude nor the criteria for reaching sound decisions.” Cox, Labor and the Antitrust Laws — A Preliminary Analysis, 104 U. Pa. L. Rev. 252, 269-270 (1955); see Winter, Collective Bargaining and Competition: The Application of Antitrust Standards to Union Activities, 73 Yale L. J. 14 (1963).
*712 I.
Pennington presents a case of a union negotiating with the employers in the industry for wages, fringe benefits, and working conditions. Despite allegations of conspiracy, which connotes clandestine activities, it is no secret that the United Mine Workers, acting to further what it considers to be the best interests of its members, espouses a philosophy of achieving uniform high wages, fringe benefits, and good working conditions. As the quid pro quo for this, the Union is willing to accept the burdens and consequences of automation. Further, it acts upon the view that the existence of marginal operators who cannot afford these high wages, fringe benefits, and good working conditions does not serve the best interests of the working miner but, on the contrary, depresses wage standards and perpetuates undesirable conditions. This has been the articulated policy of the Union since 1933. See Baratz, The Union and the Coal Industry 62-74 (1955). The Mine Workers has openly stated its preference, if need be, for a reduced working force in the industry, with those employed working at high wages, rather than for greater total employment at lesser wage rates. Ibid. See also Folliard, Roar of John L. Lewis Subdued at 85, The Washington Post, Feb. 14, 1965, § E, p. 3; Hearings before a Subcommittee of the Senate Committee on Labor and Public Welfare on S. Res. 274, 81st Cong., 2d Sess., 1-10; Hearings before a Subcommittee of the House Committee on Education and Labor, Welfare of Miners, 80th Cong., 1st Sess.; 1 Proceedings of Forty-Second Consecutive Constitutional Convention of the United Mine Workers of America, 9-14 (1956). Consistent with this view, the Union welcomes automation, insisting only that the workers participate in its benefits.[1]
*713 Jewel Tea presents another and different aspect of collective bargaining philosophy. The Chicago Local of the Amalgamated Meat Cutters bargains for its members with small, independent service butchers as well as large automated self-service chains. It seeks from both a uniform policy that no fresh meat be sold after 6 p. m. This union policy, as my Brother White recognizes, ante, at 694-696, has a long history dating back to 1919 and has grown out of the Union’s struggle to reduce the long, arduous hours worked by butchers, which in 1919 were 81 hours per week. It took a long strike to achieve the first limitation on hours in 1920, and it has required hard extensive collective bargaining since then to maintain the policy and further reduce the number of hours worked. While it is claimed by Jewel Tea, a large operator of automated self-service markets, that it can operate beyond the set hours without increasing the work of butchers or having others do butchers’ work — a claim rejected by the trial court and the majority of this Court — it is conceded, on this record, that the small, independent service operators cannot do so. Therefore to the extent that the Union’s uniform policy limiting hours of selling fresh meat has the effect of aiding one group of employers at the expense of another, here the union policy, unlike that in Pennington, aids the small employers at the expense of the large.
Although evidencing these converse economic effects, both Pennington and Jewel Tea, as the Court in Pennington, and my Brother White’s opinion in Jewel Tea *714 acknowledge, involve conventional collective bargaining on wages, hours, and working conditions — mandatory subjects of bargaining under the National Labor Relations Act, 49 Stat. 452, as amended, 29 U. S. C. § 158 (d) (1958 ed.). Yet the Mine Workers’ activity in Pennington was held subject to an antitrust action by two lower courts. This decision was based upon a jury determination that the Union’s economic philosophy is undesirable, and it resulted in an award against the Union of treble damages of $270,000 and $55,000 extra for respondent’s attorneys’ fees. In Jewel Tea, the Union has also been subjected to an antitrust suit in which a court of appeals, with its own notions as to what butchers are legitimately interested in, would subject the Union to a treble damage judgment in an as yet undetermined amount.
Regretfully these cases, both in the lower courts and in expressions in the various opinions filed today in this Court, as I shall demonstrate, constitute a throwback to past days when courts allowed antitrust actions against unions and employers engaged in conventional collective bargaining, because “a judge considered” the union or employer conduct in question to be “socially or economically” objectionable. Duplex Co. v. Deering, supra, at 485 (dissenting opinion of Mr. Justice Brandéis). It is necessary to recall that history to place the cases before us in proper perspective.
II.
The Sherman Act, 26 Stat. 209, 15 U. S. C. § 1 et seq. (1958 ed.), “was enacted in the era of 'trusts’ and of 'combinations’ of businesses and of capital organized and directed to control of the market by suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern.” Apex Hosiery Co. v. Leader, 310 U. S. 469, 492-493. Despite the fact that the Act was therefore aimed at business combinations, not labor unions, and *715 that a careful reading of the legislative history shows that the interdiction of “every” contract, combination or conspiracy in restraint of trade was not intended to apply to labor unions and the activities of labor unions in their own interests, aimed at promotion of the labor conditions of their members,[2] the Court in Loewe v. Lawlor, 208 U. S. 274, held that the Act proscribed activities of labor unions and, in that case, prohibited the use of a secondary boycott as part of an organizational campaign. Congress responded by adopting in §§ 6 and 20 of the Clayton Act, 38 Stat. 731, 738, 15 U. S. C. § 17, 29 U. S. C. § 52 (1958 ed.), what has come to be known as the labor exemption from the Sherman Act. See Frankfurter & Greene, The Labor Injunction 139-144 (1930). Section 6 states: “The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor . . . organizations, instituted for the purposes of mutual help ... or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof . ...” [3] Sec *716 tion 20 barred federal court injunctions “in any case between an employer and employees, or between employers and employees” involving a dispute over terms and conditions of employment. It specifically prohibited issuance of injunctions against certain activities such as quitting work, persuading others to do the same, etc., and concluded with the provision: “nor shall any of the acts specified ... be considered or held to be violations of. any law of the United States.”
These congressional provisions, however, were frustrated, as thoughtful commentators have, acknowledged, by decisions of this Court. See, e. g., Frankfurter & Greene, op. cit. supra, at 165-176; Cox, op. cit. supra, at 257-258. See also H. R. Rep. No. 669, 72d Cong., 1st Sess., 3, 7-8. In Duplex Co. v. Deering, 254 U. S. 443, the Court was again faced with a secondary boycott used as an organizational tool, that is, a post-Clayton Act Lawlor situation. Despite the Act, the Court again held the activity to violate the Sherman Act on the basis that § 6 did not confer immunity from antitrust liabilities “where . . . [unions] depart from . . . normal and legitimate objects . . . .” Id., at 469. What constitutes a “normal and legitimate” union object was to be determined by the courts; the Duplex Court held that a secondary boycott was not such an object. Section 20 was swept away on the ground that it only applied to controversies between “employers and employees,” and that *717 “it would do violence to the . . . language employed,” id., at 472, to hold that the section included an attempt to organize a new employer. Mr. Justice Brandéis, in dissent (joined by Mr. Justice Holmes and Mr. Justice Clarke), forcefully argued that the decision of the majority violated the clear congressional purpose to remove from judges the determination of “what public policy in regard to the industrial struggle demands,” id., at 485, and to “declare the right of industrial combatants to push their struggle to the limits of the justification of self-interest . . . .” Id., at 488.
Duplex was followed by other decisions of this Court and lower federal courts which sustained the application of the antitrust laws to curb both primary and secondary union activity. See, e. g., Bedford Co. v. Stone Cutters Assn., 274 U. S. 37; Coronado Coal Co. v. United Mine Workers, 268 U. S. 295; Alco-Zander Co. v. Amalgamated Clothing Workers, 35 F. 2d 203 (D. C. E. D. Pa.); United States v. Railway Employees’ Dept., 283 F. 479 (D. C. N. D. Ill.).
Mr. Justice Brandéis’ dissent in Duplex has, however, carried the day in the courts of history as evidenced by subsequent congressional action and decisions of this Court. The Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. § 101 (1958 ed.), was passed by Congress in 1932 expressly to overrule the majority opinion of Duplex and the cases that followed it and to affirm the philosophy of the dissenters in those cases. See United States v. Hutcheson, 312 U. S. 219, 235-236; Milk Wagon Drivers Union v. Lake Valley Farm Products, Inc., 311 U. S. 91, 102-103; New Negro Alliance v. Sanitary Grocery Co., 303 U. S. 552, 562.[4] Although framed in terms of restric *718 tions on the use of injunctions, this Court in United States v. Hutcheson, 312 U. S. 219, 235-236, recognized that the Act’s “underlying aim . . . was to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated . . . See H. R. Rep. No. 669, 72d Cong., 1st Sess., 6-8. As this Court has recognized, congressional enactment of the Norris-LaGuardia Act “was prompted by a desire ... to withdraw federal courts from a type of controversy for which many believed they were ill-suited and from participation in which, it was feared, judicial prestige might suffer.” Marine Cooks & Stewards v. Panama S. S. Co., 362 U. S. 365, 370, n. 7. The Wagner Act, 49 Stat. 449, as amended, 29 U. S. C. § 151 et seq. (1958 ed.), followed the Norris-LaGuardia Act and gave affirmative protection and encouragement to union organization and collective bargaining and further reflected congressional desire to narrow the judiciary’s role in the formulation of labor policy by entrusting principal enforcement responsibility to an administrative agency.
Following adoption of the Norris-LaGuardia and Wagner Acts, in Apex Hosiery Co. v. Leader, 310 U. S. 469, the Court gave proper recognition to congressional purpose in this area. In holding that union use of a sit-down strike as an organizational tool did not violate the antitrust laws, even though attended with violence, the Court stated:
“Strikes or agreements not to work, entered into by laborers to compel employers to yield to their demands, may restrict to some extent the power of employers who are parties to the dispute to compete in the market with those not subject to such demands. *719 But . . . the mere fact of such restrictions on competition does not in itself bring the parties to the agreement within the condemnation of the Sherman Act. . . . Furthermore, successful union activity, as for example consummation of a wage agreement with employers, may have some influence on price competition by eliminating that part of such competition which is based on differences in labor standards. Since, in order to render a labor combination effective it must eliminate the competition from nonunion made goods, ... an elimination of price competition based on differences in labor standards is the objective of any national labor organization. But this effect on competition has not been considered to be the kind of curtailment of price competition prohibited by the Sherman Act.” [5] 310 U. S., at 503-504.
Apex was followed by the Court in United States v. Hutcheson, supra, which has been recognized as a landmark case. Mr. Justice Frankfurter, after an extensive review of the history of the application of the antitrust laws to labor unions, concluded, for the Court, that “whether trade union conduct constitutes a violation *720 of the Sherman Law is to be determined only by reading the Sherman Law and § 20 of the' Clayton Act and the Norris-LaGuardia Act as a harmonizing text of outlawry of labor conduct.” 312 U. S., at 231. The Court then went on to hold: “So long as a union acts in its self-interest and does not combine with non-labor groups,[6] the licit and the illicit . . . are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.” 312 U. S., at 232.
In Allen Bradley Co. v. Union, 325 U. S. 797, the only relevant case in this area since Hutcheson, the Court reaffirmed the Hutcheson holding “that a union’s exemption from the Sherman Act is not to be determined by a judicial ‘judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.’ ” 325 U. S., at 810-811. The Court, however, held that the Union was subject to Sherman Act liability on the facts of the case as there were “industry-wide understandings, looking not merely to terms and conditions of employment but also to price and market control. Agencies were set up composed of representatives of all three groups [the union-contractor-manufacturer combination] to boycott recalcitrant local contractors and manufacturers and to bar from the [New York City] area equipment manufactured outside its boundaries.” *721 325 U. S., at 799-800. And “this combination of business men” “intended to and did restrain trade in and monopolize the supply of electrical equipment in the New York City area to the exclusion of equipment manufactured in and shipped from other states, and did also control its price and discriminate between its would-be customers.” 325 U. S., at 800-801. Thus Allen Bradley involved two elements: (1) union participation in price fixing and market allocation, with the only union interest being the indirect prospect that these anticompetitive devices might increase employers’ profits which might then trickle down to the employees, (2) accomplished by the union’s joining a combination or conspiracy of the employers.[7]
To round out this history it should be noted that, while rejecting attempts to restrict or eliminate the labor exemption from the antitrust laws,[8] Congress, in the 1947 Taft-Hartley Act, 61 Stat. 136, 29 U. S. C. § 141 et seg. (1958 ed.), and the 1959 Landrum-Griffin Act, 73 Stat. 519, 29 U. S. C. §401 et seq. (1958 ed., Supp. V), has taken steps to proscribe union activities which, in its legislative judgment, it considers to be detrimental to the public good. Consistent, however, with its policy of not turning the lawfulness of union conduct on subjective judgments of purpose or effect, a policy expressed in §§ 6 and 20 of the Clayton Act and in the Norris-LaGuardia Act, Congress did this by making unlawful certain specific union activities under the National Labor *722 Relations Act. Congress, for example, has curbed the secondary boycott in § 8 (b) (4) (B) of the National Labor Relations Act, preserving from condemnation certain secondary activities deemed legitimate.[9] The jurisdictional strike is regulated by § 8 (b)(4)(D) in conjunction with § 10 (k) of the Act.[10] Union opposition to automation has been regulated to the limited extent Congress wished to do so by § 8 (b) (6) of the Act.[11] Strikes and pressure by minority unions for organization or recognition are controlled by §§ 8 (b)(4)(C) and 8 (b) (7) of the Act.[12] Union restrictions on contracting out and subcontracting of work are delineated by § 8 (e) of the Act.[13] For the issue presently before us, it is most *723 significant that in enacting this last prohibition, Congress in the exercise of its legislative judgment, specifically excepted the unusual situations existing in the garment and building industries. Such exceptions for particular industries, which may be proper subjects of legislative discretion, would, of course, be most difficult for courts to make in employing a broad proscription like the Sherman Act.
III.
In my view, this history shows a consistent congressional purpose to limit severely judicial intervention in collective bargaining under cover of the wide umbrella of the antitrust laws, and, rather, to deal with what Congress deemed to be specific abuses on the part of labor unions by specific proscriptions in the labor statutes. I believe that the Court should respect this history of congressional purpose and should reaffirm the Court’s holdings in Apex and Hutcheson which, unlike earlier decisions, gave effect to, rather than frustrated, the congressional design. The sound approach of Hutcheson is that the labor exemption from the antitrust laws derives from a synthesis of all pertinent congressional legislation — the nature of the Sherman Act itself,[14] § § 6 and 20 of the Clayton Act, the Norris-LaGuardia Act, the Fair Labor Standards Act,[15] the Walsh-Healey[16] and Davis-Bacon[17] Acts, and the Wagner Act with its Taft-Hartley and Landrum-Griffin amendments. This last statute, in particular, provides *724 that both employers and unions must bargain over “wages, hours, and other terms and conditions of employment.” 29 TJ. S. C. §§ 158 (a) (5), (b) (3), (d) (1958 ed.). Following the sound analysis of Hutcheson, the Court should hold that, in order to effectuate congressional intent, collective bargaining activity concerning mandatory subjects of bargaining under the Labor Act is not subject to the antitrust laws.[18] This rule flows directly from the Hutcheson holding that a union acting as a union, in the interests of its members, and not acting to fix prices or allocate markets in aid of an employer conspiracy to accomplish these objects, with only indirect union benefits, is not subject to challenge under the antitrust laws. To hold that mandatory collective bargaining is completely protected would effectuate the congressional policies of encouraging free collective bargaining, subject only to specific restrictions contained in the labor laws, and of limiting judicial intervention in labor matters via the antitrust route — an intervention which necessarily under the Sherman Act places on judges and juries the determination of “what public policy in regard to the industrial struggle demands.” Duplex Co. v. Deering, supra, at 485 (dissenting opinion of Mr. Justice Brandéis). See Winter, Collective Bargaining and Competition: The Application of Antitrust Standards to Union Activities, 73 Yale L. J. 14 (1963).
Section 6 of the Clayton Act made it clear half a century ago that it is not national policy to force workers to compete in the “sale” of their labor as if it were a commodity or article of commerce. The policy was confirmed *725 and extended in the subsequent Norris-LaGuardia Act. Other federal legislation establishing minimum wages and maximum hours takes labor standards out of competition. The Fair Labor Standards Act, 52 Stat. 1060, as amended, 29 U. S. C. §§ 201-219 (1958 ed.), clearly states that the existence of “labor conditions” insufficient for a “minimum standard of living . . . constitutes an unfair method of competition in commerce.” 29 U. S. C. § 202 (a). Moreover, this Court has recognized that in the Walsh-Healey Act, 49 Stat. 2036, as amended, 41 U. S. C. §§ 35-45 (1958 ed.), Congress brought to bear the “leverage of the Government’s immense purchasing power to raise labor standards” by eliminating substandard producers from eligibility for public contracts. Endicott Johnson Corp. v. Perkins, 317 U. S. 501, 507. See also Davis-Bacon Act, 46 Stat. 1494, 40 U. S. C. § 276a (1958 ed.). The National Labor Relations Act itself clearly expresses one of its purposes to be “the stabilization of competitive wage rates and working conditions within and between industries.” 29 U. S. C. § 151. In short, business competition based on wage competition is not national policy and “the mere fact of such restrictions on competition does not . . . bring the parties . . . within the condemnation of the Sherman Act.” Apex Hosiery Co. v. Leader, supra, at 503.
The National Labor Relations Act also declares it to be the policy of the United States to promote the establishment of wages, hours, and other terms and conditions of employment by free collective bargaining between employers and unions. The Act further provides that both employers and unions must bargain about such mandatory subjects of bargaining. This national scheme would be virtually destroyed by the imposition of Sherman Act criminal and civil penalties upon employers and unions engaged in such collective bargaining. To tell the parties *726 that they must bargain about a point but may be subject to antitrust penalties if they reach an agreement is to stultify the congressional scheme.
Moreover, mandatory subjects of bargaining are issues as to which union strikes may not be enjoined by either federal or state courts.[19] To say that the union can strike over such issues but that both it and the employer are subject to possible antitrust penalties for making collective bargaining agreements concerning them is to assert that Congress intended to permit the parties to collective bargaining to wage industrial warfare but to prohibit them from peacefully settling their disputes. This would not only be irrational but would fly in the face of the clear congressional intent of promoting “the peaceful settlement' of industrial disputes by subjecting labor-management controversies to the mediatory influence of negotiation.” Fibreboard Paper Prods. Corp. v. Labor Board, 379 U. S. 203, 211.
Congress has also recognized that some labor organizations seek, as in Pennington, through industry-wide bargaining, to eliminate differences in labor standards among employers. This was common knowledge in 1935 when the Wagner Act was enacted. The aims and practices of unions engaging . in industry-wide bargaining were well known in 1947 at the time of the Taft-Hartley revision. Then and on subsequent occasions Congress re *727 fused to enact bills to restrict or-prohibit industry-wide bargaining. See, e. g., H. R. 3020, 80th Cong., 1st Sess., §§ 2 (16), 9 (f)(1), 12 (a)(3)(A), 12 (a)(4), H. R. Rep. No. 245, 80th Cong., 1st Sess., 24, 73; note 8, supra, and citations contained therein; H. R. 8449, 82d Cong., 2d Sess. Nor can it be seriously argued that multi-employer bargaining, as in Jewel Tea, introduces an illegal element or is otherwise opposed to the national labor policy. Indeed, this Court, to implement congressional policy sanctioning multi-employer bargaining, permitted employers to resort, under certain circumstances, to lockouts to protect the integrity of the multi-employer bargaining unit. See Labor Board v. Truck Drivers Union, No. 449, 353 U. S. 87; Labor Board v. Brown, 380 U. S. 278.[20] The wisdom of permitting industry-wide and multi-employer bargaining is for Congress to decide, unless this Court is to return to the discredited approach of the majority in Duplex and substitute its notion for that of Congress as to how unions and employers should conduct their collective bargaining.
IV.
The Court in Pennington today ignores this history of the discredited judicial attempt to apply the antitrust laws to legitimate collective bargaining activity, and it *728 flouts the clearly expressed congressional intent that, since “[t]he labor of a human being is not a commodity or article of commerce,” [21] the antitrust laws do not proscribe, and the national labor policy affirmatively promotes, the “elimination of price competition based on differences in labor standards,” Apex Hosiery Co. v. Leader, supra, at 503. While purporting to recognize the indisputable fact that the elimination of employer competition based on substandard labor conditions is a proper labor union objective endorsed by our national labor policy and that, therefore, “a union may make wage agreements with a multi-employer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from other employers,” Pennington, ante, at 665, the Court holds that “a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units.” Ibid.
This rule seems to me clearly contrary to the congressional purpose manifested by the labor statutes, and it will severely restrict free collective bargaining. Since collective bargaining inevitably involves and requires discussion of the impact of the wage agreement reached with a particular employer or group of employers upon competing employers, the effect of the Court’s decision will be to bar a basic element of collective bargaining from the conference room. If a union and employer are prevented from discussing and agreeing upon issues which are, in the great majority of cases, at the central core of bargaining, unilateral force will inevitably be substituted for rational discussion and agreement. Plainly and simply, the Court would subject both unions and employers to antitrust sanctions, criminal as well as civil, if in collective bargaining they concluded a wage agreement and, as part of the agreement, the union has undertaken to use its best efforts *729 to have this wage accepted by other employers in the industry. Indeed, the decision today even goes beyond this. Under settled antitrust principles which are accepted by the Court as appropriate and applicable, which were the basis for jury instructions in Pennington, and which will govern it upon remand, there need not be direct evidence of an express agreement. Rather the existence of such an agreement, express or implied, may be inferred from the conduct of the parties. See, e. g., Interstate Circuit, Inc. v. United States, 306 U. S. 208; American Tobacco Co. v. United States, 328 U. S. 781; United States v. Paramount Pictures, Inc., 334 U. S. 131; Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U. S. 537. Or, as my Brother Douglas, concurring in Pennington, would have it, conduct of the parties could be prima facie evidence of an illegal agreement. Ante, at 673. As the facts of Pennington illustrate, the jury is therefore at liberty to infer such an agreement from “clear” evidence that a union’s philosophy that high wages and mechanization are desirable has been accepted by a group of employers and that the union has attempted to achieve like acceptance from other employers. For, as I have pointed out, stripped of all adjectives, this is what Pennington presents. Yet the Court today holds “the alleged agreement between UMW and the large operators to secure uniform labor standards throughout the industry, if proved, was not exempt from the antitrust laws.” Ante, at 669.
The rational thing for an employer to do, when faced with union demands he thinks he cannot meet, is to explain why, in economic terms, he believes that he cannot agree to the union requests. Indeed, the Labor Act’s compulsion to bargain in good faith requires that he meaningfully address himself to the union’s requests. See Labor Board v. Truitt Mfg. Co., 351 U. S. 149. A recurring and most understandable reason given by employers for their resistance to union demands is that com *730 petitive factors prevent them from accepting the union’s proposed terms. Under the Court’s holding today, however, such a statement by an employer may start both the employer and union on the road to antitrust sanctions, criminal and civil. For a jury may well interpret such discussion and subsequent union action as showing an implicit or secret agreement to impose uniform standards on other employers. Nor does the Court’s requirement that there be “direct or indirect evidence of the conspiracy,” ante, at 665, n. 2 — whatever those undefined terms in the opinion may mean — provide any substantial safeguard for uninhibited collective bargaining discussions. In Pennington itself, the trial court instructed the jury that a union’s unilateral actions did not subject it to antitrust sanctions, and yet the jury readily inferred a “conspiracy” from the “direct or indirect evidence” of the union’s publicly stated policy in favor of high wages and mechanization, its collective bargaining agreement with a group of employers establishing high wages, and its attempts to obtain similar high wages from other employers.
Furthermore, in order to determine whether, under the Court’s standard, a union is acting unilaterally or pursuant to an agreement with employers, judges and juries will inevitably be drawn to try to determine the purpose and motive of union and employer collective bargaining activities. The history I have set out, however, makes clear that Congress intended to foreclose judges and juries from roaming at large in the area of collective bargaining, under cover of the antitrust laws, by inquiry into the purpose and motive of the employer and union bargaining on mandatory subjects. Such roaming at large, experience shows, leads to a substitution of judicial for congressional judgment as to how collective bargaining should operate.
The case of Alco-Zander Co. v. Amalgamated Clothing Workers, 35 F. 2d 203 (D. C. E. D. Pa.), is one example of *731 judicial inadequacy in this sensitive economic area. That case involved a situation where the unionized garment industry in New York was being undersold by the lower-priced, nonunion garment industry of Philadelphia. The union, fearing for the future of the jobs of its members employed in the unionized New York industry, started an organizing drive in Philadelphia. A federal district court enjoined, as a violation of the antitrust laws, the union’s organizational campaign which consisted of primary strikes and peaceful picketing. The court declared that “the primary purpose of the campaign for the unionization of the Philadelphia market was the protection of the unionized markets in other states,” and that “the object of the strikes was to put an end to all production in Philadelphia under nonunion conditions and only to permit it to be resumed if and when the manufacturers were willing to operate upon an union basis and under union wage scales.'” 35 F. 2d, at 205. It is clear, therefore, that the court enjoined the union’s activities as antitrust violations because it believed that this purpose and object was socially and economically undesirable. Alco-Zander and other similar cases[22] were almost universally condemned as striking examples of judicial interference in legitimate collective bargaining via the antitrust laws because of j'udge-made notions as to the economic wisdom of the union conduct. See, e. g., Berman, Labor and the Sherman Act 248-259 (1930); Comment, 24 Ill. L. Rev. 925 (1930)'. There is no doubt that the Norris-LaGuardia *732 Act was designed to overrule them. See H. R. Rep. No. 669, 72d Cong., 1st Sess., 3-7; S. Rep. No. 163, 72d Cong., 1st Sess., 9-10.
Congress in the Norris-LaGuardia Act and other labor statutes, as this Court recognized in Apex and Hutcheson, determined that judicial notions of the social and economic desirability of union action should not govern antitrust liability in the area of collective bargaining. The fact that a purpose-motive approach necessarily opens the door to basing criminal or civil penalties under the Sherman Act on just such a determination and to making courts the arbiters of our national labor policy is borne out not only by the history of cases like Alco-Zander but also by the cases decided today.
In Pennington, central to the alleged conspiracy is the claim that hourly wage rates and fringe benefits were set at a level designed to eliminate the competition of the smaller nonunion companies by making the labor cost too high for them to pay. Indeed, the trial judge charged that there was no violation of the Sherman Act in the establishing of wages and welfare payments through the national contract, “provided” the mine workers and the major coal producers had not agreed to fix “high” rates “in order to drive the small coal operators out of business.” Under such an instruction, if the jury found the wage scale too “high” it could impute to the union the unlawful purpose of putting the nonunion operators out of business. It is clear that the effect of the instruction therefore, was to invite 12 jurymen to become arbiters of the economic desirability of the wage scale in the Nation’s coal industry. The Court would sustain the judgment based on this charge and thereby put its stamp of approval on this role for courts and juries.
The Court’s approval of judges and juries determining the permissible wage scale for working men in an industry is confirmed by the Court’s express statement “there are *733 limits to what a union or an employer may offer or extract in the name of wages,” Pennington, ante, at 665. To allow a jury to infer an illegal “conspiracy” from the agreed-upon wage scale means that the jury must determine at what level the wages could be fixed without impelling the parties into the ambit of the antitrust laws. Is this not another way of saying that, via the antitrust route, a judge or jury may determine, according to its own notions of what is economically sound, the amount of wages that a union can properly ask for or that an employer can pay? It is clear, as experience shows, that judges and juries neither have the aptitude nor possess the criteria for making this kind of judgment. In Pennington, absent the alleged conspiracy, would the wage rate and fringe benefits have been lower? Should they have been lower? If Pennington were an action for injunctive relief, what would be the appropriate remedy to reach the labor cost which is at the heart of the alleged antitrust violation? A judicial determination of the wage rate? A judicial nullification of the existing rate with a direction to negotiate a lower one? I cannot believe that Congress has sanctioned judicial wage control under the umbrella of the Sherman Act, for, absent a national emergency,[23] Congress has never legislated wage control in our free-enterprise economy.
The history I have set out makes clear that Congress intended to foreclose judges and juries from making essentially economic judgments in antitrust actions by determining whether unions or employers had good or bad motives for their agreements on subjects of mandatory bargaining. Moreover, an attempted inquiry into the motives of employers or unions for entering into collective bargaining agreements on subjects of mandatory bargain *734 ing is totally artificial. It is precisely in this area of wages, hours, and other working conditions that Congress has recognized that unions have a substantial, direct, and basic interest of their own to advance.
As I have discussed, the Court’s test is not essentially different from the discredited purpose-motive approach. Only rarely will there be direct evidence of an express agreement between a union and an employer to impose a particular wage scale on other employers. In most cases, as was true of Pennington, the trial court will instruct the jury that such an illegal agreement may be inferred from the conduct — “indirect evidence” — of the union and employers. To allow a court or a jury to infer an illegal agreement from collective bargaining conduct inevitably requires courts and juries to analyze the terms of collective bargaining agreements and the purposes and motives of unions and employers in agreeing upon them. Moreover, the evidence most often available to sustain antitrust liability under the Court’s theory would show, as it did in Pennington, simply that the motives of the union and employer coincide — the union seeking high wages and protection from low-wage, nonunion competition, and the employer who pays high wages seeking protection from competitors who pay lower wages. When there is this coincidence of motive, does the illegality of the “conspiracy” turn on whether the Union pursued its goal of a uniform wage policy through strikes and not negotiation? As I read the Court’s opinion this is precisely what the result turns on and thus unions are forced, in order to show that they have not illegally “agreed” with employers, to pursue their aims through strikes and not negotiations. Yet, it is clear that such a result was precisely what the National Labor Relations Act was designed to prevent. The only alternative to resolution of collective bargaining issues by force available to the parties under the Court’s holding is the encouragement of fraud and deceit. An employer will be forced to take a *735 public stand against a union’s wage demands, even if he is willing to accept them, lest a too ready acceptance be used by a jury to infer an agreement between the union and employer that the same wages will be sought from other employers. Yet, I have always thought that in collective bargaining, even more than in other areas of contractual agreement, the objective is open covenants openly arrived at.
Furthermore, I do not understand how an inquiry can be formulated in terms of whether the union action is unilateral or is a consequence of a “conspiracy” with employers independently of the economic terms of the collective bargaining agreement. The agreement must be admitted into evidence and the Court holds that its economic consequences are relevant. In the end, one way or another, the entire panoply of economic fact becomes involved, and judges and juries under the Court’s view would then be allowed to speculate about why a union bargained for increased compensation, or any other labor standard within the scope of mandatory bargaining. It is precisely this type of speculation that Congress has rejected.
The plain fact is that it makes no sense to turn antitrust liability of employers and unions concerning subjects of mandatory bargaining on whether the union acted “unilaterally” or in “agreement” with employers. A union can never achieve substantial benefits for its members through unilateral action; I should have thought that the unsuccessful history of the Industrial Workers of the World, which eschewed collective bargaining and espoused a philosophy of winning benefits by unilateral action, proved this beyond question. See Dulles, Labor in America 208-223 (1949); Chaplin, Wobbly (1948). Furthermore, I cannot believe that Congress, by adopting the antitrust laws, put its stamp of approval on this discredited IWW philosophy of industrial relations; rather, in the Clayton Act and the labor statutes, Congress has *736 repudiated such a philosophy. Our national labor policy is designed to encourage the peaceful settlement of industrial disputes through the negotiation of agreements between employers and unions. Unions cannot, as the history of the IWW shows, successfully retain employee benefits by unilateral action; nor can employers be assured of continuous operation without contractual safeguards. The history of labor relations in this country shows, as Congress has recognized, that progress and stability for both employers and employees can be achieved only through collective bargaining agreements involving mutual rights and responsibilities.
This history also shows that labor contracts establishing more or less standardized wages, hours, and other terms and conditions of employment in a given industry or market area are often secured either through bargaining with multi-employer associations or through bargaining with market leaders that sets a “pattern” for agreements on labor standards with other employers. These are two similar systems used to achieve the identical result of fostering labor peace through the negotiation of uniform labor standards in an industry. Yet the Court makes antitrust liability for both unions and employers turn on which of these two systems is used. It states that uniform wage agreements may be made with multi-employer units but an agreement cannot be made to affect employers outside the formal bargaining unit. I do not believe that the Court understands the effect of its ruling in terms of the practical realities of the automobile, steel, rubber, shipbuilding, and numerous other industries which follow the policy of pattern collective bargaining. See Chamberlain, Collective Bargaining 259-263 (1951); note 20, su-pra. I also do not understand why antitrust liability should turn on the form of unit determination rather than the substance of the collective bargaining impact on the industry.
*737 Finally, it seems clear that the essential error at the core of the Court’s reasoning is that it ignores the express command of Congress that “[t]he labor of a human being is not a commodity or article of commerce,” [24] and therefore that the antitrust laws do not prohibit the “elimination of price competition based on differences in labor standards.” Apex Hosiery Co. v. Leader, supra, at 503. This is made clear by a simple question that the Court does not face. Where there is an “agreement” to seek uniform wages in an industry, in what item is competition restrained? The answer to this question can only be that competition is restrained in employee wage standards. That is, the union has agreed to restrain the free competitive market for labor by refusing to provide labor to other employers below the uniform rate. Under such an analysis, it would seem to follow that the existence of a union itself constitutes a restraint of trade, for the object of a union is to band together the individual workers in an effort, by common action, to obtain better wages and working conditions — i. e., to obtain a higher price for their labor. The very purpose and effect of a labor union is to limit the power of an' employer to use competition among workingmen to drive down wage rates and enforce substandard conditions of employment. If competition between workingmen to see who will work for the lowest wage is the ideal, all labor unions should be eliminated. Indeed the Court itself apparently realizes that its holding that the antitrust laws are violated when a labor union agrees with employers not to compete on wages is premised on the belief that labor is a commodity and that this premise leads to the logical conclusion that unions themselves restrain trade in this commodity. This is the only reason I can imagine for the Court’s felt need, in 1965, to assert that “[t]he antitrust laws do not *738 bar the existence and operation of labor unions as such.” Pennington, ante, at 661. (Emphasis added.)
As I have already discussed, however, if one thing is clear, it is that Congress has repudiated the view that labor is a commodity and thus there should be competition to see who can supply it at the cheapest price. See pp. 710-713, supra. The kind of competition which is suppressed by employer-union agreement on uniform wages can only be competition between unions to see which union will agree to supply labor at a lower rate,, or competition between employers in the sale of their products based on differences in labor costs. Neither type of “suppression,” I submit, can be supported as a restraint of trade condemned by the antitrust laws. No one, I think, believes that Congress intended that there be an economic system under which unions would compete with each other to supply labor at the lowest possible cost. It is equally clear that Congress did not intend that competition among manufacturers should be carried on, not on the basis of their relative efficiency or ability to produce what the consumer demands, but on their ability to operate at substandard wage rates. One of the important social advantages of competition mandated by the antitrust laws is that it rewards the most efficient producer and thus ensures the optimum use of our economic resources. This result, as Congress recognized, is not achieved by creating a situation in which manufacturers compete on the basis of who pays the lowest wages. As this Court stated in Apex Hosiery Co. v. Leader, supra, at 503-504, the “elimination of price competition based on differences in labor standards is the objective of any national labor organization. But this effect on competition has not been considered to be the kind of curtailment of price competition prohibited by the Sherman Act.”
The assumption running through the Court’s opinion in Pennington, as well as the opinion of my Brother Douglas, is that giving full scope to the congressional *739 exemption of labor unions from the antitrust laws will operate to the advantage of large employers and big unions to the prejudice of small employers. Although I cannot see how that should affect the result reached on the basis of congressional intent even if the assumption were true, see Hunt v. Crumboch, 325 U. S. 821, 825, n. 1, I feel compelled to note that this assumption is not accurate and is belied by the actualities of industrial relations. Experience in this area shows that frequently unions first organize the small and weak employers. These small employers are understandably afraid that unless other, larger employers are also organized, effective competition will be impossible. They will thus often seek to have the union attempt to organize and bargain for similar labor standards with their larger competitors so that the requirement to pay high union wages will not force the small businessmen to close down their enterprises.
The Court’s holding in Pennington today flies in the face of Apex and Hutcheson and restrains collective bargaining in the same way .as did the holding of the majority in Duplex — a holding which Congress has expressly repudiated in favor of Mr. Justice Brandéis’ dissenting views. It represents contemporary manifestations of the reluctance of judges to give full effect to congressional purpose in this area and the substitution of judges’ views for those of Congress as to how free collective bargaining should operate.[25]
*740 y.
The judicial expressions in Jewel Tea represent another example of the reluctance of judges to give full effect to congressional purpose in this area and the substitution by judges of their views for those of Congress as to how free collective bargaining should operate. In this case the Court of Appeals would have held the Union subject to the Sherman Act’s criminal and civil penalties because in the court’s social and economic judgment, the determination of the hours at which meat is to be sold is a “proprietary” matter within the exclusive control of management and thus the Union had no legitimate interest in bargaining over it. My Brother Douglas, joined by Mr. Justice Black and Mr. Justice Clark, would affirm this judgment apparently because the agreement was reached through a multi-employer bargaining unit. But, as I have demonstrated above, there is nothing even remotely illegal about such bargaining. Even if an independent conspiracy test were applicable to the Jewel Tea situation, the simple fact is that multi-employer bargaining conducted at arm’s length does not constitute union abetment of a business combination. It is often a self-defensive form of employer bargaining designed to match union strength. See Labor Board v. Truck Drivers Union, supra; Labor Board v. Brown, supra.

 For these policies, John L. Lewis, the long-time head of the Mine Workers, has been variously condemned and praised. See, e. g., *713 Baratz, op. cit. supra, at 138-151; Folliard, op. cit. supra; Alinsky, John L. Lewis 346-372 (1949); Wechsler, Labor Baron: A Portrait of John L. Lewis (1944). Among the praise has been a Presidential Medal of Freedom, awarded on September 14, 1964, in which Mr. Lewis was cited as follows: “Eloquent spokesman of labor, he has given voice to the aspirations of the industrial workers of the country and led the cause of free trade unions within a healthy system of free enterprise.”

 The legislative history is well summarized in Berman, Labor and the Sherman Act 3-54 (1930). See also Frankfurter & Greene, The Labor Injunction 139, n. 17 (1930).

 One of the expressed aims of the Act appears to have been approval of such union-employer agreements as “the protocol in the sweated industries of New York City and vicinity which abolished sweatshops and long hours of labor, and the burdensome, miserable toil prevailing, and established the combination of employers and of work men and work women by which certain standards are to be enforced, and [which provided that] no employer can become a member of the manufacturers’ association in that trade unless he is willing to undersign an agreement by which the conditions prevailing in the protocol will be inaugurated by him.” H. B,. Hep. No. 627, 63d Cong., 2d Sess., 15; S. Rep. No. 698, 63d Cong., 2d Sess., 11. This quotation was a part of the statement of Samuel Gompers to the House Committee in which he argued for adoption of a labor exemption to the Sherman Act. He stated his fear that while he did not believe *716 that courts would declare the existence of labor unions per se to be violations of the Sherman Act, he believed that such protocols as the one discussed above would be held unlawful and stated that the manufacturers’ association involved had already been sued. He was therefore seeking a congressional enactment declaring such a protocol lawful both for labor and business. It is significant that in both Senate and House Reports, almost the entire discussion of § 6 of the Clayton Act consists of'this extract from Mr. Gompers’ testimony. The inference is inescapable that the Clayton Act was designed, inter alia, to immunize such protocols from antitrust liability.

 As the House Committee stated in reporting out the Norris-LaGuardia Act, “[t]he purpose of the bill is to protect the rights of labor in the same manner the Congress intended when it enacted the Clayton Act, October 15,1914 (38 Stat. L., 738), which act, by reason *718 of its construction and application by the Federal courts, is ineffectual to accomplish the congressional intent.” H. R. Rep. No. 669, 72d Cong., 1st Sess., 3; see also id., at 7-8.

 In reaching this conclusion the Court relied, in part, on the provision of § 6 of the Clayton Act that “the labor of a human being is not a commodity or article of commerce . . . nor shall such [labor] organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in the restraint of trade under the antitrust laws.” 310 TJ. S., at 503. It also relied on provisions of the Norris-LaGuardia Act, the Railway Labor Act, 48 Stat. 1185, as amended, 45 U. S. C. § 151 et seq. (1958 ed.), the National Labor Relations Act, the Walsh-Healey Act, 49 Stat. 2036, as amended, 41 U. S. C. §§35-45 (1958 ed.), and the Fair Labor Standards Act, 52 Stat. 1060, as amended, 29 U. S. C. §§201-219 (1958 ed.). Its conclusion was that “[t]his series of acts clearly recognizes that combinations of workers eliminating competition among themselves and restricting competition among their employers based on wage cutting are not contrary to the public policy.” 310 U. S., at 504, n. 24.

 The Court clarified this statement by citation to United States v. Brims, 272 U. S. 549, a case involving an employer conspiracy to allocate markets. See Bedford Co. v. Stone Cutters Assn., 274 U. S. 37, 56, 64 (dissenting opinion of Mr. Justice Brandéis). This, of course, is quite similar to the situation presented in Allen Bradley Co. v. Union, 325 U. S. 797. It is far different from the situations in the cases decided today and the situation in the garment industry which was specifically approved by Congress in the Clayton Act. See note 3, supra.

 Cf. the opinion of my Brother White in Jewel Tea, ante, at 688-689, 692-693; infra, pp. 727-729, United States v. Brims, 272 U. S. 549, discussed in note 6, supra.

 See, e. g., H. R. 3020 §§301 (a), (b), 80th Cong., 1st Sess.; S. Rep. No. 105, 80th Cong., 1st Sess., 22; H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 65; 93 Cong. Reo. A844-A846, A1910, 1834-1844, 3834-3836, 4130-4136, 4858-4875, 7347; S. 2573, 87th Cong., 1st Sess.; Sovern, Some Ruminations on Labor, the Antitrust Laws and Allen Bradley, 13 Lab. L. J. 957 (1962).

 As this case does not involve an Allen Bradley situation, it is not necessary to determine whether Congress, in enacting these Taft-Hartley boycott and related revisions to the Act and at the same time rejecting an attempted codification of the Allen Bradley doctrine in the antitrust laws, intended that all union activities in this area be covered solely under the comprehensive regulation of the labor statutes with their restricted injunctive and damage provisions. See sources cited in note 8, supra. Cf. Teamsters Union v. Lester Morton Trucking Co., 377 U. S. 252; Teamsters Union v. Oliver, 358 U. S. 283; Garner v. Teamsters Union, 346 U. S. 485.

 As an antitrust issue, see United States v. Hutcheson, supra.

 As an antitrust issue, see United States v. Hod Carriers, 313 TJ. S. 539, affirming United States v. Carrozzo, 37 F. Supp. 191 (D. C. N. D. HI.).

 As antitrust issues, see United States v. Building & Construction Trades Council, 313 U. S. 539.

 In Pennington the collective bargaining agreement restricted subleasing, which is a mining form of subcontracting. Indeed, the Pennington case bristles with potential unfair labor practices. The Mine Workers allegedly imposed the national wage agreement on the small coal operators at a time when the Union did not represent their employees. For a minority union to enter into a collective bargaining contract covering all the employees of a unit has been held to infringe the rights of employees under § 7 of the NLRA. Garment Workers v. Labor Board, 366 U. S. 731. A “protective wage clause” in the national wage agreement provided that signatory companies would not buy coal mined under terms and conditions less favorable than *723 those in the national wage agreement. The Labor Board has held that this type of clause violates § 8 (e) of the NLRA, as amended, 29 U. S. C. § 158 (e) (1958 ed., Supp. Y). See Raymond O. Lewis, W. A. Boyle & John Owens, etc., 144 N. L. R. B. 228. See also Raymond O. Lewis et al., 148 N. L. R. B.-, 1964 CCH, N. L. R. B. Decisions ¶ 13,334.

 See pp. 700-701, swpra; Apex Hosiery Co. v. Leader, supra.

 52 Stat. 1060, as amended, 29 U. S. C. §§ 201-219 (1958 ed.).

 49 Stat. 2036, as amended, 41 U. S. C. §§ 35-45 (1958 ed.).

 46 Stat. 1494, as amended, 40 ü. S. C. § 276a (1958 ed.).

 Although I agree with my Brother White in Jewel Tea that the doctrine of primary jurisdiction does not apply here, decisions of the Labor Board as to what constitutes a subject of mandatory bargaining are, of course, very significant in determination of the applicability of the labor exemption.

 See, e. g., Weber v. Anheuser-Busch, Inc., 348 U. S. 468; Garner v. Teamsters Union, 346 U. S. 485, 490-491. Although Allen Bradley held that the Clayton and Norris-LaGuardia Acts precluded federal courts from enjoining activities concerned with even some nonman-datory subjects of bargaining, Congress has since provided that union insistence on bargaining over nonmandatory subjects is an unfair labor practice, cf. Labor Board v. Wooster Division of Borg-Warner Corp., 356 U. S. 342, and thus the Labor Board can order the union to cease and desist from such insistence as well as from auxiliary conduct like strikes designed to effectuate it; see Local 164, Brotherhood of Painters v. Labor Board, 110 U. S. App. D. C. 294, 293 F. 2d 133.

 Today, between 80% and 100% of the workers under union agreement are covered by multi-employer contracts in such important industries as men’s and women’s clothing, coal mining, building construction, hotel, longshoring, maritime, trucking, and warehousing. Between 60% and 80% of unionized workers are under multi-employer pacts in- baking, book and job printing, canning and preserving, textile dyeing and finishing, glass and glassware, malt liquor, pottery and retail trades. See Reynolds, Labor Economics and Labor Relations 170 (3d ed. 1959). Furthermore, in some other major industries relatively uniform terms of employment are obtained through the negotiation of a contract with one leading employer and the subsequent acceptance of that contract’s key provisions, with only minor modifications by the other employers in the industry. See Chamberlain, Collective Bargaining 259-263 (1951).

 Section 6 of the Clayton Act. See p. 701, supra.

 See, e. g., Coronado Coal Co. v. United Mine Workers, 268 U. S. 295 (union primary strike activities in an organizational campaign enjoined on the grounds that the “purpose” of the organizational campaign was to prevent nonunion coal from undercutting union coal); United States v. Railway Employees’ Dept., 283 F. 479 (D. C. N. D. Ill.) (primary strike against railroad held invalid on the ground that it interrupted commerce); Bedford Co. v. Stone Cutters Assn., 274 U. S. 37 (union’s unilateral refusal to work on nonunion goods held invalid).

 See Exec. Orders Nos. 9250 and 9328, 7 Fed. Reg. 7871, 8 Fed. Reg. 4681, promulgated pursuant to the Act of October 2, 1942, 56 Stat. 765.

 Section 6 of the Clayton Act. See p.- 701, supra.

 The Court in Pennington states that it “cannot conclude that the national labor policy provides any support” for agreements whereby unions undertake to attempt to obtain uniform terms from other employers in the industry. Pennington, ante, at 667. In making this statement the Court ignores clear congressional expressions in §§ 6 and 20 of the Clayton Act, the Norris-LaGuardia Act, the Fair Labor Standards Act, the Walsh-Healey Public Contracts Act, the Davis-Bacon Act, and the express purpose of the National Labor Relations Act. See generally, pp. 709-713, supra. Moreover, the Court’s reliance on three old Labor Board cases for its conclusions is clearly misplaced. These cases hold, at most, as the Court itself recognizes, that *740 an employer may not refuse to recognize a union chosen by his employees or refuse to sign any contract until such time as the union has successfully organized the employer’s competitors. Such situations, of course, are completely different from the situation in which an employer with established collective bargaining relations voluntarily agrees with the union that the union will attempt to have other employers accept similar or uniform terms. They also are completely different from the situation in which an employer signs a collective bargaining agreement the terms 'of which contain a “most favored nation” clause, or labor standards on a sliding scale adjusted to the average or some other prevailing wage standard.